

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0082-14

**THE STATE OF TEXAS**

**v.**

**ADELFO RAMIREZ CRUZ, Appellee**

**ON APPELLEE'S PETITION FOR DISCRETIONARY REVIEW
FROM THE THIRD COURT OF APPEALS
TRAVIS COUNTY**

**KELLER, P.J., delivered the opinion of the unanimous Court.**

We determine that questions about the defendant's name and phone number that were asked in a custodial interview in the present case did not fall within the "booking" exception to the *Miranda*[1] rule. We arrive at this conclusion because, though the questions may have been the type that would be asked during a booking procedure, the questions were not asked during a booking procedure, and the circumstances did not otherwise reveal that the questions were reasonably related

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

to an administrative purpose. We also conclude that the court of appeals erred in holding that questions about the defendant's name and phone number did not constitute interrogation. Consequently, we reverse the judgment of the court of appeals.

## I. BACKGROUND

### A. Facts

Mario Carbajal-Plata, a taco-stand operator, was shot and killed in Austin. The police recovered a soft-drink bottle that a witness said had been handled by the shooter. Fingerprint analysis produced a match in the National Crime Information Center (NCIC) database. The fingerprint was matched to an individual who was variously known as Jose Rodriguez, Jorge Negron, and Pablo Jaimes. This individual was, in fact, appellee, whose real name was not known to law enforcement at the time.[2] The NCIC database indicated that appellee had been arrested several times in the Chicago area. A call to Chicago law enforcement revealed that appellee had a pending Illinois warrant for a misdemeanor offense of driving under the influence (DUI).

Detective Jeff Greenwalt, the lead homicide investigator assigned to the murder case, secured an arrest warrant for the murder. He then called the United States Marshals' Office in Chicago and asked them to arrest appellee on the Illinois DUI warrant but also requested that no mention be made of the Texas warrant or the homicide investigation. Appellee was arrested on the DUI warrant and taken to a jail in Berwyn, a suburb of Chicago. Appellee was booked by local law enforcement, who asked appellee's name, date of birth, phone number, and address. The answers to these questions were written on a standard form. Appellee gave his name as Jorge Negron and gave an address and

---

[2] Although appellee's true name was not known, his fingerprints and arrest data were maintained under a unique FBI identification number.

date of birth.[3] He did not give his phone number on initial book-in, but a phone number was later added to the form.[4]

Detective Greenwalt and his partner, Detective Frank Rodriguez, traveled from Texas to Illinois and arrived at the Berwyn jail approximately fourteen hours after appellee was arrested. Appellee was placed in an interview room, and his interview with the Texas detectives was recorded. Before giving *Miranda* warnings, Detective Rodriguez introduced himself and his partner by name, without saying what agency they were affiliated with, and asked appellee some biographical questions as detailed below.[5]

Detective Rodriguez told appellee that they needed his name because immigration wanted to put a hold on him and the authorities had several names for him. The detective also asked for appellee's address and phone number and asked whether he had a cell phone. Appellee was also asked whether he was living with anyone and how long he had been in the United States. Appellee identified himself as Jorge Negron and gave the same date of birth that was listed on the Berwyn booking form. He claimed not to remember his exact address but gave a street name that matched the address on the booking form. He gave a phone number that differed by two digits from the phone number on the booking form,[6] and he identified this number as a cell phone belonging to his

---

[3] The date of birth was false.

[4] It is unknown who added the phone number.

[5] The direct questioning of appellee was conducted by Detective Rodriguez in Spanish, but Detective Greenwalt suggested some questions for Detective Rodriguez to ask.

[6] The digits in question were "94" on the form and "69" in the interview. The trial court found that the cell number added to the booking sheet was not the same cell number given in the interview.

girlfriend. Appellee also responded that he was from Guanajuato, Mexico, and that he entered the United States in 2000, returned to Mexico in 2004, and reentered the United States in 2008.

After asking these questions and receiving appellee's responses, Detective Rodriguez read appellee the *Miranda* warnings. Appellee then asked to speak to an attorney, and the interview was terminated. Detective Greenwalt acknowledged at the motion-to-suppress hearing (and the trial court found) that he wanted to obtain appellee's phone number to assist in determining appellee's true identity, and to show through cell tower information where the phone—if it was a cell phone—was located on the date of the murder. Detective Greenwalt also testified that he did not tell appellee that he was a suspect in a homicide because Detective Greenwalt was afraid appellee would "stop talking to us altogether."

After the interview, Detectives Greenwalt and Rodriguez went to the address listed on the Berwyn booking form. They obtained permission from appellee's girlfriend to search the residence. The girlfriend told Detective Rodriguez that she had a cell phone that appellee used and gave a phone number that matched the number given by appellee in the interview. During the search, Detective Greenwalt discovered appellee's birth certificate with his true name and date of birth. After returning to Austin, Detective Greenwalt obtained records for the cell-phone number supplied by the girlfriend and appellee. The phone records showed that the phone was in Austin on the date of the murder and that phone calls hit cell towers close to the crime scene.

## B. Trial

Appellee filed a motion to suppress. A hearing was held, at which Detectives Greenwalt and Rodriguez testified. The trial court issued findings of fact and conclusions of law. The findings of fact are consistent with the summary given above. The trial court granted the motion to suppress in

part, ruling that the interview between appellee and the Texas detectives was inadmissible. The trial court denied the motion to suppress in all other respects, ruling that appellee's arrest was valid and that the following evidence was admissible: appellee's responses to booking questions asked by Illinois law enforcement, fingerprints obtained upon arrest, cell-phone records obtained by the Texas detectives, and evidence obtained from the search of appellee's residence.

### C. Appeal

The State appealed the trial court's ruling that the interview was inadmissible. The State argued that the questions during the interview—and more specifically, the questions relating to the cell-phone number—fell within the "booking" exception to the *Miranda* rule.

The court of appeals pointed out that the detectives never testified that they intended to—or in fact did—share appellee's responses in the interview with Illinois officials.[7] Moreover, the court of appeals observed that there was no discussion in the trial record about appellee's ultimate transfer to Texas.[8] Consequently, the court of appeals stated that it could not conclude on the record presented to it that "the booking questions exception applie[d]."[9]

Nevertheless, the court of appeals concluded that the questions in the interview satisfied a related but distinct exception to *Miranda* involving "routine inquiries normally attendant to arrest and custody."[10] The court found that this exception was satisfied because the questions were purely

---

[7] *State v. Cruz*, No. 03-12-00728-CR, slip op. at 8 (Tex. App.–Austin January 10, 2014) (not designated for publication).

[8] *Id.*

[9] *Id.*

[10] *Id.*

biographical and did not relate to an element of murder and because nothing in the record indicated that Detective Rodriguez should have known that the questions were likely to elicit an incriminating response.[11]  Further, the court held that the detectives' subjective hope that appellee's phone number or address might lead to relevant evidence did not transform an otherwise routine inquiry into an interrogation because the test for what constitutes interrogation focuses primarily upon the perceptions of the suspect, rather than the intent of the police.[12]  Consequently, the court of appeals reversed the trial court's order suppressing appellee's statements.

## II. ANALYSIS

### A. Interrogation and the Booking Exception

The *Miranda* rule generally prohibits the admission into evidence of statements made in response to custodial interrogation when the suspect has not been advised of certain warnings (including that the suspect has a right to remain silent and a right to counsel).[13]  In the *Miranda* context, "interrogation" means "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response."[14]  This "should know" test is the general test for determining whether interrogation occurs.[15]  This test focuses primarily upon

---

[11]  *Id.* at 9-11.

[12]  *Id.* at 11.

[13]  *Miranda*, 384 U.S. at 466-71.

[14]  *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).

[15]  *Alford v. State*, 358 S.W.3d 647, 661 (Tex. Crim. App. 2012).  The syntax of the initial wording of this test in *Innis* could lead one to believe that express questioning is automatically interrogation, without regard to the "should know" test.  *See* 446 U.S. at 301 ("the term 'interrogation' under *Miranda* refers not only to express questioning, *but also* to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an

the perceptions of the suspect, rather than the intent of the police.[16]

But the Supreme Court explicitly carved out an exception to the general test for matters "normally attendant to arrest and custody."[17] Routine booking questions are normally attendant to arrest and custody, and recognition of this fact has given rise to what has been called the "routine

---

incriminating response") (emphasis added); *Jones v. United States*, 779 A.2d 277, 282 (D.C. 2001) (defendant argued that express questioning is interrogation without regard to "should know" test). However, a later sentence in *Innis* makes reasonably clear that the "should know" test applies even to express questioning, and other courts have construed *Innis* in that manner. *See Innis*, 446 U.S. at 301-02 ("But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend *only* to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.") (emphasis added); *United States v. Cash*, 733 F.3d 1264, 1277 (10th Cir. 2013) (declining to read the term "express questioning" literally: "although asking a question is relevant to determining whether an interrogation has occurred, it is neither sufficient nor necessary"); *United States v. Hunter*, 708 F.3d 938, 954 (7th Cir. 2013) ("[N]ot all direct questions posed by police to a suspect constitute 'interrogation.' Only questions that are 'reasonably likely to elicit an incriminating response from the suspect' are improper.") (brackets and internal quotations marks from original omitted); *United States v. Fleck*, 413 F.3d 883, 893 & n.2 (8th Cir. 2005); *United States v. Foster*, 227 F.3d 1096, 1102-03 (9th Cir. 2000); *United States v. Bogle*, 114 F.3d 1271, 1275 (D.C. Cir. 1997); *Jones*, 779 A.2d at 282-83 (applying the "should know" test and concluding that defendant's argument that express questioning is automatically interrogation "has been rejected by numerous authorities" and is not persuasive); *State v. Morrisey*, 351 Mont. 144, 163, 214 P.3d 708, 723-24 (2009) ("A definition that included any question posed by a police officer would be broader than that required to implement the policy of *Miranda* itself."); *see also* Wayne R. LaFave and Jerold H. Israel, CRIMINAL PROCEDURE, § 6.7(b), at 326-28 (2d ed.1992) ("Putting the matter this way would certainly suggest that *any* time a person in custody is asked a question, surely the *Miranda* requirements apply. But no such absolute rule had been recognized by lower courts prior to *Innis*, and it does not seem that all of those decisions are cast in doubt by the *Innis* decision. If other 'words or actions' fall within *Miranda* only if 'the police should know [they] are likely to elicit an incriminating response,' then it is not fanciful to suggest that certain types of questioning also do not come within *Miranda* because they are unlikely to produce that kind of response.").

[16] *Innis*, 446 U.S. at 301.

[17] *Id.* at 300-01 ("That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.").

booking question exception" to the *Miranda* rule.[18] Although termed a "booking" exception, this exception appears to be somewhat broader than booking and encompasses routine administrative processing associated with arrest or custody.[19] The point of the exception is that questions that fall within the exception "serve a legitimate administrative need."[20]

The types of questions that are allowed under this exception are generally requests for biographical data,[21] such as "name, address, height, weight, eye color, date of birth, and current age."[22] Some courts have expressly included among this data a suspect's telephone number.[23] To determine whether a particular question falls within the booking exception, we ask "whether the question reasonably relates to a legitimate administrative concern, applying an objective standard."[24]

If a question is a legitimate administrative question, then it does not matter whether the officer should know that the question is reasonably likely to elicit an incriminating response.[25] That

---

[18] *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (plurality op. of Brennan J., joined by O'Connor, Scalia, and Kennedy, JJ.); *Alford v. State*, 358 S.W.3d 647, 654 (Tex. Crim. App. 2012).

[19] *See Muniz*, 496 U.S. at 601 (referring to questions "necessary to complete booking or *pretrial services*") (emphasis added); *State v. Rheaume*, 176 Vt. 413, 420, 853 A.2d 1259, 1263 (2004) (questions "were asked as part of routine processing").

[20] *Alford*, 358 S.W.3d at 654.

[21] *Muniz*, 496 U.S. at 601.

[22] *Id.*; *Alford*, 358 S.W.3d at 654.

[23] *United States v. Broadus*, 7 F.3d 460, 464 (6th Cir. 1993); *United States v. McLaughlin*, 777 F.2d 388, 391 (8th Cir. 1985); *United States v. Sims*, 719 F.2d 375, 378 (11th Cir. 1983); *Bobo v. State*, 820 N.W.2d 511, 517 (Minn. 2012); *Hughes v. State*, 346 Md. 80, 95, 695 A.2d 132, 139 (1997).

[24] *Alford*, 358 S.W.3d at 659-60.

[25] *Id.* at 660-61.

is, a legitimate administrative question is exempt from the "should know" test and is deemed not to be interrogation.[26]

### B. Biographical Data: "Should Know" versus "Administrative"

As a practical matter, a question that seeks to elicit biographical data may be deemed "not interrogation" under either of two theories. First, such a question may be deemed "not interrogation" because it does not meet the general test for interrogation, i.e. it does not meet the "should know" test. That is, a court could decide that a particular question about biographical data was so innocuous that its tendency to produce an incriminating response was not something the police officer should have known.[27] Second a biographical question may be deemed "not interrogation" under the "booking" (or "administrative") exception. That is, a court could decide that a particular question about biographical data was a routine administrative inquiry.

These two situations often overlap. Routine administrative questions are generally innocuous questions that are not reasonably likely to elicit an incriminating response.[28] Nevertheless, we must

---

[26] *Id.*

[27] *See Jones*, 779 A.2d at 284 (request for suspect's name was not reasonably likely, under the circumstances, to elicit incriminating response); *State v. Sallis*, 574 N.W.2d 15 (Iowa 1998) (quoting *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996): "request for routine information necessary for basic identification purposes is not interrogation under *Miranda*" unless "the government agent should reasonably be aware that the information sought . . . is directly relevant to the substantive offense charged").

[28] *See Williams v. Jaglowski*, 269 F.3d 778, 785 (7th Cir. 2001) (holding that it was highly unlikely that the defendant would have incriminated himself in any way by giving his date of birth and citing another case that noted that *Miranda* warnings are not generally required before asking arrestees for "booking information" such as name and address because such information is not likely to evoke an incriminating response); *United States v. Edwards*, 885 F.2d 377, 385 (7th Cir. 1989) ("In our opinion questions such as 'what is your name?' and 'where do you live?' will not usually constitute interrogation within the meaning of *Miranda*. In the first place, it cannot be said that the police, when asking such questions, 'should know [that the questions are] probably likely to evoke

analyze the two issues separately.

### C. "Should Know"

The court of appeals concluded that the detectives' questions did not meet the "should know" test for interrogation. The court of appeals articulated four reasons in support of its conclusion: (1) the questions involved purely biographical data, (2) no evidence in the record suggests that the detectives should have known that the questions were reasonably likely to elicit incriminating responses, (3) the questions did not relate to an element of murder, and (4) the subjective hope of the detectives that their questioning would ultimately lead to incriminating evidence did not transform the questioning into interrogation because the focus of the "should know" test is on the suspect.

Without deciding whether the court of appeals was accurate in characterizing the information sought here as purely biographical, we conclude that the biographical nature of the question does not alone exempt it from being interrogation. In *Muniz*, the Supreme Court indicated that biographical questions were not automatically exempt from *Miranda*'s requirements,[29] and other courts have

---

an incriminating response from a suspect.' . . . . Finally, as the magistrate noted, even in an arrest situation such questions will eventually be asked during booking and the 'prevailing view is that routine inquiries during booking are lawful even absent the *Miranda* warnings.'").

[29] 496 U.S. at 601 (plurality op. of Brennan J., joined by O'Connor, Scalia, and Kennedy, JJ.) ("We disagree with the Commonwealth's contention that Officer Hosterman's first seven questions regarding Muniz's name, address, height, weight, eye color, date of birth, and current age do not qualify as custodial interrogation as we defined the term in *Innis, supra,* merely because the questions were not intended to elicit information for investigatory purposes."), 609 (Marshall, J., concurring and dissenting) ("[T]he police in this case should have known that the seven booking questions were reasonably likely to elicit incriminating responses.").

indicated that such questions may constitute interrogation under the "should know" test.[30]  In *Thomas*, the District of Columbia Court of Appeals held that questioning a suspect about his name was reasonably likely to elicit an incriminating response when the officers knew that the suspect had already provided authorities with a false name.[31]  The DC court recited similar holdings by other jurisdictions.[32]

The court of appeals's third and fourth reasons suggest that a question qualifies as interrogation only if it seeks to elicit evidence that is directly incriminating.  There is some validity to this view.  The *Miranda* rule is concerned with the incriminating nature of the responses to questions, not with what evidence those responses might lead to, and the rule does not bar the admission of other evidence that is later obtained as a result of a suspect's statements.[33]  In *California v. Byers*, a plurality of the United States Supreme Court stated that "identity, when made known, may lead to inquiry that in turn leads to arrest and charge" but "those developments depend on different factors and independent evidence."[34]  We agree that questioning that seeks to elicit

---

[30]  *Jones*, 779 A.2d at 284 (citing *Thomas v. United States*, 731 A.2d 415 (D.C. 1999) for the proposition that questions about one's name can, under certain circumstances, be reasonably likely to elicit an incriminating response); *Hughes*, 346 Md. at 95-96, 695 A.2d at 140 (even a question that appears innocuous on its face can be reasonably likely to elicit an incriminating response under certain circumstances); *United States v. Parra*, 2 F.3d 1058, 1068 (10th Cir. 1993) (question about someone's true name in order to link person to incriminating immigration file).

[31]  731 A.2d at 426.

[32]  *Id.* at 423-26 (discussing *Parra*, 2 F.3d 1058; *Timbers v. Commonwealth,* 503 S.E.2d 233 (Va. App. 1998); *State v. Stevens*, 181 Wis. 2d 410, 511 N.W. 2d 591 (1994)).

[33]  *Contreras v. State*, 312 S.W.3d 566, 582-83 (Tex. Crim. App. 2010) (discussing *Chavez v. Martinez*, 538 U.S. 760 (2003) and citing *Michigan v. Tucker*, 417 U.S. 433 (1974) and *Oregon v. Elstad*, 470 U.S. 298 (1985)).

[34]  402 U.S. 424, 434 (1971) (plurality op.).

biographical data does not become interrogation simply because the identifying information may later aid law enforcement in conducting a criminal investigation. So, questioning appellee about his address and phone number did not become interrogation simply because the answers enabled police to locate and search his home or obtain his cell-phone records.

But on the present record, appellee's name and phone number had incriminating value in themselves and did not simply lead to other incriminating evidence. The detectives informed appellee that they had several names for him. At that point, a reasonable person in appellee's position would have understood that answering the question about his name would have shown that he had previously given a false name, which could be a criminal offense by itself[35] or would be evidence of his consciousness of guilt for a criminal offense.[36] Appellee's position is similar to the defendant in *Thomas* and other cases, where the officers were not asking for the suspect's name for the first time, but were attempting to solicit the suspect's true name after what they suspected to be a false name had already been given.[37]

---

[35] *See* TEX. PENAL CODE § 38.02 (failure to identify or giving a false or fictitious name).

[36] *Felder v. State*, 848 S.W.2d 85, 98 (Tex. Crim. App. 1992) ("Like flight, the fact that appellant presented false identification to Officer Carlson when he was pulled over indicates a 'consciousness of guilt' and an awareness that he needed to conceal his identity from law enforcement officials."); *United States v. Thompson*, 690 F.3d 977, 991 (8th Cir. 2012) (stating that "it is today universally conceded that" certain facts including "assumption of a false name . . . are admissible as evidence of consciousness of guilt, and thus of guilt itself") (brackets omitted).

[37] The United States Supreme Court held in *Hiibel v. Sixth Judicial Dist. Court of Nevada* that a defendant's conviction for his refusal to identify himself did not violate the Fifth Amendment. 542 U.S. 177, 190-91 (2004). The Court reached this conclusion because the defendant's refusal to disclose his identity was not based upon any articulated, real, and appreciable fear that his name would be used to incriminate him. *Id.* at 190. Notably, the Court left open the possibility that "a case may arise where there is a substantial allegation that furnishing identity . . . would have given the police a link in the chain of the evidence needed to convict the individual . . . ." *Id.* at 191. We believe this is just such a case.

The record also shows that the detectives were seeking to obtain appellee's cell-phone number, which could link him, through cell tower data, to a location and time that was close to the murder. Not only should the detectives have known, but, at least with respect to appellee's phone number, they *did* know, that the questioning was likely to lead to an incriminating response. As Detective Greenwalt acknowledged, he hoped to show through cell-phone information where appellee was at the time of the murder. The Supreme Court's recognition that the existence of interrogation turns primarily on the perception of the suspect[38] does not completely exclude a consideration of police intent.[39] When police questioning is actually "designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect."[40] We conclude that Detective Rodriguez's questions about appellee's name and phone number satisfied the "should know" test for what constitutes interrogation.

### D. Administrative

The next issue is whether the detective's questions may be deemed "not interrogation" because they were routine administrative inquiries. As we explained in *Alford*, a question falls within the "booking" exception if, under an objective standard, "the question reasonably relates to a legitimate administrative concern."[41] We will assume, without deciding, that each of the questions asked by Detective Rodriguez was, by its content, the type of question that could be reasonably

---

[38] *Innis*, 446 U.S. at 301.

[39] *Id.* at 301 n.7.

[40] *Id.*

[41] 358 S.W.3d at 659-60.

related to a legitimate administrative concern. We must then ask: In determining whether a question is reasonably related to a legitimate administrative concern, do we look solely to the content of the question? We think that the answer is "no." Whether a question reasonably relates to an administrative concern must be ascertained by both the content of the question and the circumstances in which the question is asked.

A number of courts have pointed to the need to look at the circumstances in which a question is asked in judging whether it is truly a routine administrative inquiry. The Court of Appeals of Maryland has counseled that courts should consider the totality of the circumstances, including the "location of the questioning, along with the nature of the crime of which the arrestee is suspected."[42] The Supreme Court of Wisconsin has refused to extend the booking exception to an interrogation occurring at the time of arrest inside the suspect's home.[43] The Tenth Circuit held that the booking exception did not apply to an officer who questioned a suspect who was about to make bond because the question was for the admitted purpose of linking the suspect to his immigration file rather than to obtain booking information.[44] In a footnote to its holding that certain questions were not exempt from *Miranda* as questions seeking routine biographical data for booking purposes, the Supreme Court of Georgia observed that the suspect "had been through the booking procedure prior to the interview at issue, making it unclear what paperwork the agent was

---

[42] *Hughes*, 346 Md. at 97, 695 A.2d at 141.

[43] *Stevens*, 181 Wis. 2d at 434-35, 511 N.W.2d at 599 ("this court will not extend the [booking] exception to incriminating questions asked at the time of the arrest").

[44] *Parra*, 2 F.3d at 1067-68.

generating."[45]

In concluding that questions about a murder suspect's name were not routine booking inquiries, the District of Columbia Court of Appeals pointed out that nothing the detective in that case had done "reflected any interest in 'booking' [the murder suspect] for the marijuana offense he had fortuitously and improvidently committed in the presence of the police."[46] The detective had not claimed that he was completing any standard booking form during his questioning, and there was no evidence that the suspect was being fingerprinted or photographed.[47] Finally, the court observed that the detective's questioning eventually turned to the murder offense for which the suspect "had not been arrested and could not have been 'booked.'"[48]

The Sixth Circuit considered "[t]he location, the nature of the questioning[,] and the failure to take notes or document the defendant's identity" as supporting its conclusion that the booking exception did not apply.[49] The court further stated that the booking exception usually applies to questioning that occurs at the police station in situations in which there is "active documentation of a defendant's answers."[50] Saying that courts should "carefully scrutinize the facts surrounding the encounter to determine whether the questions are legitimate booking questions or a pretext for eliciting incriminating information," the Supreme Court of California listed a variety of factors to

---

[45] *State v. Nash*, 279 Ga. 646, 650 n.3, 619 S.E.2d 684, 687 n.3 (2005).

[46] *Thomas*, 731 A.2d at 422.

[47] *Id.*

[48] *Id.*

[49] *United States v. Pacheco-Lopez*, 531 F.3d 420, 424-25 (6th Cir. 2008)

[50] *Id.* at 425.

consider:

- the nature of the questions, such as whether they seek merely identifying data necessary for booking;

- the context of the interrogation, such as whether the questions were asked during a non[-]investigative clerical booking process and pursuant to a standard booking form or questionnaire;

- the knowledge and intent of the government agent asking the questions;

- the relationship between the question asked and the crime the defendant was suspected of committing;

- the administrative need for the information sought;

- and any other indications that the questions were designed, at least in part, to elicit incriminating evidence and merely asked under the guise or pretext of seeking routine biographical information.[51]

We are also guided by Supreme Court precedent in an analogous area of the law—the inventory-search exception to the warrant requirement under the Fourth Amendment. Like the booking exception to the *Miranda* rule, the inventory search exception is based on administrative concerns.[52] The Supreme Court has held that "standardized criteria . . . or established routine . . . must regulate the opening of containers found during inventory searches" because "an inventory search must not be a ruse for a general rummaging in order to discover evidence."[53] We need not decide how close the analogy is between these two exceptions to decide that the absence of evidence of standardized or routine procedures in this case is at least a relevant factor in determining whether

---

[51] *People v. Williams*, 56 Cal. 4th 165, 187-88, 294 P.3d 1005, 1021-22 (2013).

[52] *Colorado v. Bertine*, 479 U.S. 367, 371 (1987) (inventory-search exception centers "upon the reasonableness of routine administrative caretaking functions").

[53] *Florida v. Wells*, 495 U.S. 1, 4 (1990).

the questioning of appellee was sufficiently administrative to be excepted from the *Miranda* rule.

Having determined that the circumstances in which a question is asked is relevant to whether the question reasonably relates to an administrative concern, we now examine the circumstances of the present case. Appellee had already been booked by Illinois authorities. By contrast, when the Texas detectives questioned him, the State of Texas had not exercised any formal authority or control over him. Appellee had not yet been detained under the authority of the Texas offense, he was not informed that the detectives were from Texas, and he was not informed that the detectives were connected with the Texas murder investigation. Moreover, the detectives did not suggest any administrative need for the questions they asked, nor did they point to any standardized or routine policy or procedure that they were following. There was no showing on this record that the questions were in any way connected with the filling out of an administrative form. We conclude that the circumstances surrounding the interrogation show that the questions were not reasonably related to an administrative purpose.

### III. DISPOSITION

We reverse the judgment of the court of appeals and affirm the suppression order of the trial court.

Delivered: May 13, 2015
Publish