PD-0082-14
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 5/28/2015 11:27:22 AM
Accepted 5/28/2015 1:12:05 PM
ABEL ACOSTA
CLERK

NO. PD-0082-14

IN THE COURT OF CRIMINAL APPEALS

AUSTIN, TEXAS

| | | |
|---|---|---|
| ADELFO RAMIREZ CRUZ | § | PETITIONER |
| VS. | § | |
| THE STATE OF TEXAS | § | RESPONDENT |

STATE'S MOTION FOR REHEARING

**TO THE HONORABLE COURT OF CRIMINAL APPEALS:**

Comes now the State of Texas, by and through the District Attorney for Travis County, and asks this Court, pursuant to Rule 79.1 of the Texas Rules of Appellate Procedure, to rehear and reconsider its decision in this case. The State respectfully asserts in this motion that the Court's analysis, in fact, supports a finding that the biographical questions asked of Petitioner by Austin Police Department Detectives are not rightly characterized as interrogation for purposes of *Miranda*.[1]

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

1

## PROCEDURAL BACKGROUND

Proceedings in the Trial Court:

Petitioner was indicted by a Travis County Grand Jury for the offense of murder alleged to have been committed on or about the 13th Day of December, 2009.[2] CR 4. Trial on this cause has not yet taken place. On November 20, 2011, Petitioner filed a motion to suppress evidence including any tangible evidence seized in connection with the case. CR 16-20. The motion further requested suppression of any statements made by Petitioner to, and any samples taken of Petitioner's person by, the Austin Police Department and "police from Chicago." CR 16-20. After several pre-trial hearings, the trial court issued an order on October 22, 2012 outlining findings of fact and conclusions of law which effectively granted Petitioner's motion to suppress with respect to any statements made by Petitioner during the interview conducted by the Austin Police Department in the Berwyn, Illinois Jail on January 6, 2010. Petitioner's Motion to Suppress was, in all other respects, denied. Cr 34-43.

Direct Appeal:

The State filed notice of appeal and, on January 10, 2014, the Third Court of Appeals reversed the order of the trial court suppressing statements made by Petitioner during the interview conducted by the Austin Police Department in the

---

[2] The indictment for Cause No. D1DC 09-302890 is styled: The State of Texas v. Adelfo Ramirez Cruz; Aliases: Jose Rodriguez, Jorge Negron, Pablo Jaimes.

Berwyn, Illinois Jail on January 6, 2010. See *State v. Cruz*, 03-12-00728-CR, 2014 Tex. App. LEXIS 296, 2014 WL 108353 (Tex. App. Austin, January 10, 2014) (not designated for publication).

Discretionary Review:

Petitioner timely filed a petition for discretionary review, which was granted on May 14, 2014. On May 13, 2015, this Court reversed the judgment of the 3rd Court of Appeals and affirmed the suppression order issued by the trial court. *State v. Cruz*, 2015 Tex. Crim. App. LEXIS 561 (Tex. Crim. App. May 13, 2015). The instant Motion for Rehearing follows.

## **RELEVANT FACTS**

On December 13, 2009, Mario Carbajal Mata was shot multiple times and killed at a taco stand he and his wife operated at 5433 South Congress Avenue in Austin, Texas. 3 RR 13-15. The Homicide Unit of the Austin Police Department (hereinafter referred to as "APD") began their investigation into the murder immediately after the shooting. 3 RR 12-13. During an interview with Irma Lopez-Benitez, the victim's wife and an eyewitness to the murder, APD learned that, in the moments before the murder, Irma had taken an order from, and served a Jarritos orange soda bottle to, a Hispanic male. 3 RR 13-14. Irma told police that after handing the bottle to the Hispanic male, she turned around and began preparing the Hispanic male's order. Irma stated that as she began cooking, the

3

victim, who had been seated inside the taco stand, stood up and walked toward her into view of the ordering window. 3 RR 14-15. Irma stated that it was at that time that she heard multiple gunshots and saw that her husband had been fatally wounded. 3 RR 15.

While processing the crime scene immediately after the murder, APD crime scene personnel observed and collected what appeared to be a freshly opened Jarritos bottle still partially filled with orange soda sitting on the table nearest to the taco stand. 3 RR 14. When it was later processed for fingerprints, at least one latent print was successfully lifted from the bottle. 3 RR 15. That print was then matched to a print stored in AFIS, a nationwide fingerprint database. 3 RR 16. The stored print was identified, in the AFIS database, as belonging to an individual by the name of Jose Rodriguez with an FBI number of 76415AB. 3 RR 16. This name and the corresponding FBI number were then run through the database maintained by the National Crime Information Center (hereinafter referred to as NCIC), which revealed that this individual had been arrested and booked for a number of offenses committed in the Chicago, Illinois area. 3 RR 16-17. NCIC records also revealed that this individual had used a different alias at the time of each arrest.  State's Ex. 6. Fingerprints collected at the time of those arrests were compared and were found to match one another as well as the print collected from the Jarritos bottle at the

crime scene. 3 RR 18-19. Booking photos taken at the time of each arrest were of the same individual. State's Ex. 7, 8, 9, 10.

APD issued a warrant for the arrest of Jose Rodriguez for the murder of Mario Carbajal Mata on December 18, 2009. 3 RR 21. At the same time, they discovered that Rodriguez had an outstanding arrest warrant out of Chicago for the offense of driving under the influence. 3 RR 20. APD then enlisted the help of the United States Marshal's Office Fugitive Task Force in the Chicago area to help find and arrest the suspect on both warrants. 3 RR 22-23. Petitioner was arrested in the Chicago area and brought into the Berwyn Police Department on January 6, 2010. 3 RR 26-27. Berwyn Booking Officer Thomas Zitko was given the task of booking Petitioner into the jail upon his initial arrival at the Berwyn Police Department. State's Ex. 16, 17 at pg. 9. Pursuant to the Berwyn Police Department's routine practice and procedure, Zitko inventoried all of Petitioner's personal property and asked Petitioner a number of questions of a biographical nature including his name, address and cell phone number. State's Ex. 16, 17 at pgs. 16-19, 23. Answers to questions posed by the Berwyn Police Department at the time of booking are routinely memorialized by hand on an inventory/booking document maintained by the Berwyn Police Department expressly for that purpose. State's Ex. 16, 17 at pg. 20 and 30-31, State's Ex. 18. Upon arrival at the Berwyn Police Department, Petitioner identified himself to Officer Zitko as Jorge Negron,

5

provided Zitko with an address on Pershing in the City of Chicago but did not provide Zitko with a cell phone number. State's Ex. 16, 17 at pg. 24. The cell phone number (773) 940-8738 appears on the inventory document but there is no information in the record with regard to who later acquired this information from Petitioner nor is there any information in the record regarding when the cell phone number was added to the document. State's Ex. 16, 17 at pg. 26, State's Ex. 18.

As soon as the U.S. Marshal's Office placed Petitioner into custody, APD was notified of his capture. 3 RR 24. APD Detectives Jeff Greenwalt and Frank Rodriguez arrived at the Berwyn Police Department thirteen or fourteen hours after Petitioner's arrest. 3 RR 26-28. Greenwalt and Rodriguez met and interviewed Petitioner at that time. 3 RR 28-29. That interview was conducted in Spanish recorded in its entirety. 3 RR 29, State's Ex. 1 and 2. The following is that portion of the January 6, 2010 interview that was at issue during the Motion to Suppress and that the trial court ultimately suppressed:

| | |
|---|---|
| Officer Rodriguez: | Hey what's up man? |
| Petitioner: | Here. |
| Officer Rodriguez: | How are you? |
| Petitioner: | Fine. |
| Officer Rodriguez: | You hungry? |
| Petitioner: | Yes hungry. |
| Officer Rodriguez: | I'm Frank Rodriguez and this is Jeff Greenwalt. |
| Petitioner: | Oh, ok, my pleasure. |
| Officer Rodriguez: | You just back from the hospital? |
| Petitioner: | Oh, yes. I felt really bad, my heart closed up really bad. |

6

| | |
|---|---|
| Officer Rodriguez: | Yeah. |
| Petitioner: | and here. |
| Officer Rodriguez: | You feel better? Were you given medicine? Or- |
| Petitioner: | Yes, I got something for the (unintelligible) and a shot. |
| Officer Rodriguez: | You, uh, you speak English? |
| Petitioner: | No. |
| Officer Rodriguez: | Nothing? Ok, he speaks Spanish also. |
| Officer Greenwalt: | I can speak but it's really hard sometimes to understand all of the- |
| Petitioner: | Oh. |
| Officer Rodriguez: is Jeff Greenwalt. | Hey, as I said I am Frank Rodriguez and he We need-keep eating- |
| Petitioner: | Ok. |
| Officer Rodriguez: | Go ahead and eat, uh, need little bits [sic] of information from you, the name, uh, things like that because Immigration wants to put a, a, a, uh, a hold against you but the troubles [sic] is that they have, it's that there are several name for you. |
| Petitioner: | How many names? |
| Detective Rodriguez: | Two or three, I don't know, so, uh, if you would please tell me what your name is. |
| Petitioner: | Jorge Negron. |
| Detective Rodriguez: | Jorge? |
| Petitioner: | Negron |
| Detective Rodriguez: | Negron? |
| Petitioner: | Uh huh |
| Detective Rodriguez: | And do you have identification? |
| Petitioner: | Yes. It's just that I have a-yes. |
| Detective Rodriguez: | Ok-your birth? |
| Petitioner: | 02/14/75 |
| Detective Rodriguez: | 7-5? |
| Petitioner: | Uh huh. |
| Detective Rodriguez: | And the address where you live? |
| Petitioner: | It's that I don't- That, I almost don't, like for example since I don't use it, I don't even know, not even the telephone number that we have, not even that. |

7

Detective Rodriguez:    What? What is the street where you live?
Petitioner:    It's on Pershing.
Detective Rodriguez:    What?
Petitioner:    Pershing.
Detective Rodriguez:    Per-pershing?
Petitioner:    Uh huh.
Detective Rodriguez:    But you don't know the number?
Petitioner:    No, I don't know the number.
Detective Rodriguez:    Is it an apartment or a house?
Petitioner:    house.
Detective Rodriguez:    And the telephone?
Petitioner:    The telephone. It's that I don't know it. I mean, I don't remember real well. Seems like it's, uh, 7-7-3, that I know, the area code is 7-7-3. It's from Chicago.
Detective Rodriguez:    Uh huh.
Petitioner:    And the number is, uh, I think 6-90.
Detective Rodriguez:    6-90?
Petitioner:    Uh huh.
Detective Rodriguez:    Uh huh?
Petitioner:    87-38, seems that's it. It's that I, I don't haven't called it.
Detective Rodriguez:    And do you have a cell?
Petitioner:    That one. It's-
Detective Rodriguez:    That's the cell number?
Petitioner:    Uh huh. My wife's.
Detective Rodriguez:    Oh, your wife's-so then you're married?
Petitioner:    Just living with her.
Detective Rodriguez:    Oh and what's her name?
Petitioner:    Henriqueta.
Detective Rodriguez:    What?
Petitioner:    Henriqueta.
Detective Rodriguez:    Henriqueta?
Petitioner:    Uh huh.
Detective Rodriguez:    Negron?
Petitioner: Well yeah.    Well, we're not married yet so it's Cardozo.
Detective Rodriguez:    Oh, Cardozo. Henriqueta Cardozo.
Petitioner:    Uh huh.

8

| | |
|---|---|
| Detective Rodriguez: | Um, Immigration wants to put a, a, when you're detained here, to uh, because they're going to want to kick you out. |
| Petitioner: | Yes. |
| Detective Rodriguez: | So, we were asked to come and talk and to, to lets you know- |
| Petitioner: | Who (unintelligible)? |
| Detective Rodriguez: | Immigration. |
| Petitioner: | Oh. |
| Detective Greenwalt: | INS. Uh, what part of Mexico are you from? |
| Petitioner: | From Guanajuato. |
| Detective Rodriguez: | Guanajuato. |
| Petitioner: | Well, I was born there but I came here from the State of Mexico. |
| Detective Rodriguez: | From the State of Mexico. And you were- how long have you been in the U.S.? |
| Petitioner: | Here, I've been here since, since-well it's that I came-in 2000 I came over here. |
| Detective Rodriguez: | In 2000? |
| Petitioner: | Yes. |
| Detective Rodriguez: | To here? |
| Petitioner: | Yes. Uh huh. |
| Detective Rodriguez: | Here to the U.S. or to-? |
| Petitioner: | Yes, to America. |
| Detective Rodriguez: | But, to Chicago or to, to-? |
| Petitioner: | Yes, here to America. I've always been here or in the Chicago area. |
| Detective Rodriguez: | So then you moved here in 2000? |
| Petitioner: | Uh huh, uh, no. I mean I arrived here in, in 2000 but from there, uh, uh, I was supposed to, I don't know what I was stopped supposedly for a DUI. |
| Detective Rodriguez: | Yes. |
| Petitioner: | I, I, I mean I have not been told really well why, since I don't understand them. |
| Detective Rodriguez: | Yes. |
| Petitioner: | But I'm told it's a DWI. |
| Detective Rodriguez: | Uh, you had one in the past. |
| Petitioner: | From, yes, I don't, I don't deny that. I, I did have one, but I never got the chance to, I |

9

|                      |                                                                                                                                                                                                                                                                                                                                                                                    |
|----------------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                      | mean to know, and then since, since I have to, uh, I got a call from Mexico that I have to go and I, I had to go-and then I recently came back again, to here- and (unintelligible).                                                                                                                                                                                                 |
| Detective Rodriguez: | When did you leave?                                                                                                                                                                                                                                                                                                                                                                 |
| Petitioner:          | I, I don't remember so well but it was when I got the DUI. I mean that, I really got some, yes they did get me but I didn't have a wreck. I didn't hit anyone. I, no one, I just, the police just stopped me and said I was drunk, and I wasn't, I mean police said I had drunk and yes I had drunk about three because I had gone to fix my car-                                       |
| Detective Rodriguez: | No. I don't want to talk about you about what you owe because you have rights and I don't want to violate your rights nor get into trouble either-until, if I am going to talk to you about those kinds of things, I need to read you your rights.                                                                                                                                     |

Detective Rodriguez (in English) to Detective Greenwalt: Do you need anything else before I go through the-?

Detective Greenwalt (in English) to Detective Rodriguez: I don't think so, I want to make sure that I understand him correctly. He said that's his wife and that that is her cell phone; that he does not have a cell phone; that he's from Guanajuato; and, he's been in Chicago since 2004-

Detective Rodriguez (in English): And he went back-

|                      |                                                                                  |
|----------------------|----------------------------------------------------------------------------------|
| Detective Rodriguez: | You left to Mexico?                                                               |
| Petitioner:          | Uh huh.                                                                           |
| Detective Rodriguez: | When was it that you went back to Mexico? For a moment, at, at what year did you leave? |
| Petitioner:          | I think 2004.                                                                     |

Detective Rodriguez (in English) to Detective Greenwalt: In 2004.

10

Detective Greenwalt (in English) to Detective Rodriguez: Where did he go back to?

Detective Rodriguez:     Where did you go?
Petitioner:     To Mexico.
Detective Rodriguez:     To-To here, to there? And you came back?
Petitioner:     Didn't come back until-until '98.
Detective Rodriguez:     Excuse me? 2008?
Petitioner:     Uh huh. Sorry. 2008.

Detective Rodriguez (in English) to Detective Greenwalt: He just came back in 2008.

Detective Rodriguez:     Here?
Petitioner     Uh huh.
Detective Rodriguez:     The uh-regarding your charges, I cannot talk to you about that until I, I read you your rights.

At this point in the interview Petitioner was *mirandized* and immediately invoked his right to counsel. State's Ex. 1 & 2, 3 RR 32. Detectives Greenwalt and Rodriguez terminated the interview and went to Petitioner's home on Pershing where they met with Petitioner's wife, Henriqueta Cardozo. 3 RR 33. Cardozo consented to a search of the home, which uncovered a birth certificate revealing Petitioner's true identity as Adelfo Ramirez Cruz with a date of birth of July 19, 1976. 3 RR 33-34, State's Ex. 11. During the search of Petitioner's home, Cardozo agreed to speak to Detective Rodriguez. 3 RR 33, State's Ex. 3 & 4. At that time, Cardozo confirmed that Petitioner had regular use of a cell phone and that the number for that cell phone was (773) 690-8738. State's Ex. 13, 3 RR 35.  Detective

11

Greenwalt later subpoenaed the records for the cell phone number provided by the Petitioner and confirmed by Cardozo and discovered that calls made and received by that cell phone hit cell phone towers close to the scene of the murder at the time the murder was committed. 3 RR 36-37.

## STATE'S SOLE GROUND FOR REVIEW ON MOTION FOR REHEARING

**Based on the Court's own analysis, Detective Rodriguez's request for Petitioner's cell phone number did not meet the "should know" test and therefore does not constitute interrogation for purposes of *Miranda*.**

On petition for discretionary review, this Court took up the question of whether the exception to *Miranda* that allows routine inquiries normally attendant to arrest and custody extends to questions of a biographical nature asked by law enforcement of a person who has already been in custody for hours but has not yet been informed of his rights under the Fifth Amendment of the United States Constitution, *Miranda v. Arizona* and TEX. CODE. CRIM. PROC. art. 38.22.

In its holding on discretionary review, the Court summarized the exceptions to interrogation under *Miranda* thusly:

> [A] question that seeks to elicit biographical data may be deemed "not interrogation" under either of two theories. First, such a question may be deemed "not interrogation" because it does not meet the general test for interrogation, i.e. it does not meet the "should know" test. That is, a court could decide that a particular question about biographical data was so innocuous that its tendency to produce an incriminating

12

response was not something the police officer should have known. Second a biographical question may be deemed "not interrogation" under the "booking" (or "administrative") exception. That is, a court could decide that a particular question about biographical data was a routine administrative inquiry.

*State v. Cruz,* 2015 Tex. Crim. App. LEXIS 561, *9 (Tex. Crim. App. May 13, 2015).

This Court then went on to hold that the facts of the instant case supported a finding that the cell phone question posed by Detective Rodriguez lacked a legitimate administrative purpose. *Id.* at *17. At the same time, this Court also held that the evidence supported a finding that Detectives Rodriguez and Greenwalt knew or should have known that the answer to their questions would produce an incriminating response. *Id.* at 13. It is this particular holding that the State would ask the court to revisit as the facts of this case do not reflect that Rodriguez and Greenwalt knew or should have known that their biographical questions, and in particular their question *regarding Petitioner's cell phone number,* would produce a response that would incriminate Petitioner in the offense with which he is charged.

This Court expressly held that "biographical data does not become interrogation simply because the identifying information may later aid law enforcement in conducting a criminal investigation." *Id.* at 12. As to the instant case, the Court further agreed that "questioning [Petitioner] about his address and phone number did not become interrogation simply because the answers enabled

13

police to locate and search his home or obtain his cell-phone records." *Id.* What this Court took issue with, apparently, was the fact that Petitioner's name and phone number had "incriminating value in themselves and did not simply lead to other incriminating evidence," specifically noting that asking for Petitioner's name "would have shown that he had previously given a false name," which, by itself, is a criminal offense. *Id. See* TEX. PENAL CODE §38.02.[3]

The State would respectfully suggest that in determining whether a question is directly incriminating, the analysis should logically turn on whether the response is likely to incriminate the suspect *in the offense actually being investigated*.

To begin with, APD detectives were not in Berwyn investigating Petitioner for giving a false name. Petitioner was not being held in the Berwyn Jail for that offense nor is he now, based on the information he provided to Rodriguez and Greenwalt, currently facing a charge, either in Illinois or in Texas, for the offense of failure to identify.[4] If the Court's analysis is meant to prohibit use of Petitioner's statement to incriminate him for the offense of failure to identify, then so be it. The

---

[3] The Court's opinion does not specifically address how the asking the Petitioner for his cell phone number was directly incriminating to him.

[4] In this way, the instant case is highly distinguishable from a number of the other cases the Court cites to support its ultimate holding. An inquiry into defendant's true identity did meet the "should know" test in *Thomas v. United States* because, unlike Petitioner, defendant's true identity directly corroborated information *the police already had* about the suspect in their case. 731 A.2d 415 (D.C. 1999). Likewise, the defendant's true identity was directly incriminating in *United States v. Parra*, because it immediately identified him as an alien in possession of firearms. 2 F.3d 1058 (10th Cir.), cert. denied, 510 U.S. 1026, 126 L. Ed. 2d 597, 114 S. Ct. 639 (1993). Moreover, in *Timbers v. Commonwealth*, once the defendant identified herself to the police by her true name, she was charged with forgery for previously providing a false name in relation to her fingerprint records. 28 Va. App. 187, 503 S.E.2d 233 (Va. App. 1998).

14

issue here, however, is whether or not Petitioner is properly implicated in a murder and the "holy grail" in this case begins and ends with the cell phone number. The cell phone number itself does not directly incriminate Petitioner in any offense. In fact, Petitioner's cell phone number falls directly into that category of information described by this Court as information "may later aid law enforcement in conducting a criminal investigation." *Id.* at 12. Under this Court's own analysis, the question that elicited the cell phone number is not rightly characterized as interrogation under *Miranda*. As this Court expressly noted, "the *Miranda* rule is concerned with the incriminating nature of the responses to questions, not with what evidence those responses might lead to, and the rule does not bar the admission of other evidence that is later obtained as a result of a suspect's statements." *Id.* at 11.

A detective leaving no stone unturned in the *hopes* that a solid clue can be found is not someone who *knows or should know* that his inquiry will unlock a mystery. Those two individuals occupy two very different locations on a continuum. When they asked Petitioner for his cell phone number, Rodriguez and Greenwalt were doing what any competent homicide investigator does: following all possible leads and investigating any reasonable hunches. Some leads and hunches bear fruit. Some do not. With respect to this particular hunch, the detectives could not have known, at the time they made the inquiry that the cell

15

phone would, in fact, inculpate Petitioner in the murder because information showing that calls made and received by that cell phone hit cell phone towers close to the scene of the murder at the time the murder was committed only became available to them after the cell phone records were subpoenaed, which was well after Petitioner's interview at the Berwyn Police Department. 3 RR 36-37. At the point when Petitioner was asked by Detective Rodriguez for his cell phone number, there was just as much of a possibility that the answer to the question would have led to evidence exculpating Petitioner as inculpating him. 3 RR 36, 41. The Third Court of Appeals rightly adopted this reasoning in its holding below:

> In this case, Detective Rodriguez's initial questions were purely biographical; he asked only [Petitioner's] name, address, phone number, whether he lived with anyone, and when he moved to the United States. None of these questions relate to an element of murder and there is nothing in the record to indicate that Detective Rodriguez should have known that these questions were likely to illicit an incriminating response. ***The fact that Detective Rodriguez subjectively hoped that [Petitioner's] phone number or address might lead to relevant evidence does not transform this otherwise routine inquiry into an interrogation***.
>
> *State v. Cruz*, 03-12-00728-CR, 2014 Tex. App. LEXIS 296, 2014 WL 108353, at *16 (Tex. App. Austin, January 10, 2014) (not designated for publication) (emphasis added).

16

## PRAYER

WHEREFORE, PREMISES CONSIDERED the State respectfully prays that the Court of Criminal Appeals grant this motion for rehearing, overrule petitioner's sole ground for review and affirm the judgment of the Third Court of Appeals.

Respectfully submitted,

ROSEMARY LEHMBERG
District Attorney
Travis County, Texas

*/s/ Kathryn A. Scales*
Kathryn A. Scales
Assistant District Attorney
State Bar No. 06022700
P.O. Box 1748
Austin, Texas 78767
(512) 854-9400
Fax No. 854-4810
Kathryn.Scales@traviscountytx.gov
AppellateTCDA@traviscountytx.gov

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i), I hereby certify, based upon the computer program used to generate this motion, that this motion contains 3,942 words, excluding words contained in those parts of the motion that Rule 9.4(i) exempts from inclusion in the word count. I certify, further, that this motion is printed in a conventional, 14-point typeface.

*/s/ Kathryn A. Scales*
Kathryn A. Scales
Assistant District Attorney

## CERTIFICATE OF SERVICE

This is to certify that the above State's Motion for Rehearing was served on Petitioner by U.S. mail, electronic mail, facsimile, or electronically through the electronic filing manager, to the Petitioner's attorneys, Michael Mowla, at 445 E. FM 1382, #3-718, Cedar Hill, Texas 75104 and Leonard Martinez, at 812 San Antonio, Suite 101, Austin, Texas 78701, and to the State's Prosecuting Attorney, Lisa McMinn, at P.O. Box 13046, Capitol Station, Austin, Texas 78711, on this 28th day of May, 2015.

*/s/ Kathryn A. Scales*
Kathryn A. Scales
Assistant District Attorney