

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| FRANKLIN DANUARI CALIX-REYES | § | No. 08-23-00357-CR |
| | § | Appeal from the |
| Appellant, | | |
| | § | 112th District Court |
| v. | | |
| | § | Of Crockett County, Texas |
| THE STATE OF TEXAS, | | |
| | § | (TC# 20-08-03163-CR) |
| Appellee. | | |

## **O P I N I O N**

A jury found Appellant Franklin Danuari Calix-Reyes guilty of one count of capital murder in the stabbing death of Romeo Enriquez Perez, and he was sentenced to life without parole. Calix-Reyes maintains the trial court erred by denying his motion to suppress a recorded statement, arguing it was taken in violation of his statutory and constitutional rights. He also contends the trial court erred by failing to correct an alleged translation error in the recorded statement and the evidence was insufficient to support his conviction. For the reasons set forth below, we affirm the trial court's judgment.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Calix-Reyes comes from Honduras and obtains employment with Perez

Calix-Reyes grew up in a small village in Honduras and attempted to enter the United States three times. On Calix-Reyes's third and successful attempt, Calix-Reyes contacted Jeferson Reyes-Ortiz, a Honduran National he met in Mexico, and the two stayed in a house in San Antonio that Jeferson's girlfriend shared with her mother.

The girlfriend's mother put Jeferson and Calix-Reyes in touch with Perez, a self-employed carpenter, who hired them to help with a bathroom remodel in Ozona, Texas. In Ozona, Perez allowed them to stay in the home he shared with his grandmother, Rafaela, who was hard of hearing and had dementia. Perez had his own bedroom, as did his grandmother, while Calix-Reyes and Jeferson slept on couches in the living room during their two weeks in Ozona. On the evening of Friday, April 24, 2020, the homeowner paid Perez $4,600 in cash for the project.

### B. Perez's body is discovered

Perez's aunt, who testified that she stopped by Rafaela's house daily to assist her, recalled noticing that the two workers were gone on Saturday, April 25, along with Perez's truck. She did not suspect anything was amiss until Tuesday morning, April 28, when she noticed a foul smell coming from Perez's bedroom. Soliciting help from other family members, Perez's cousin called for a welfare check after coming to the home and seeing Perez's body and splattered blood through his bedroom window.

Police department and sheriff's office officials arrived on the scene, entered the home, and kicked the bedroom door down. They testified that Perez's body was cold and stiff, the room was in disarray with items scattered around, and there was blood everywhere. To the left of the body,

they observed a knife wrapped in a bloody shirt and shorts. They found Perez's wallet, which had no cash in it. After taking photographs, the officers released Perez's body for an autopsy.

### C. The autopsy findings

Luisa Florez, a forensic pathologist, conducted an autopsy on April 29, 2020. She testified at trial as to her belief, based on the state of Perez's body, that he had died three to five days earlier. Perez's body weighed 140 pounds at the autopsy, and Florez estimated that he weighed 170 to 180 pounds prior to his death, noting he had lost all but 3% of his blood.

Her autopsy findings revealed that Perez had suffered from a total of 94 "sharp force" injuries throughout his body, including five "stab" wounds, i.e., deep wounds created by a sharp object, and 89 "incised wounds," i.e., superficial wounds. She explained that the incised wounds could have been caused by a "flimsy knife," but that it would take a "stronger knife" to cause the deeper stab wounds. Florez opined that one wound was caused by a serrated blade, while the others were caused by a smooth blade.

Of the five stab wounds, Florez identified two as "lethal"—one in Perez's left clavicle, which entered his left internal jugular vein and trachea, and another in the right clavicle region, which entered several arteries and veins on the right side of Perez's neck. She explained that both injuries would have caused profuse bleeding. Florez also testified that she observed numerous defensive wounds throughout Perez's body, indicating that he had "really fought hard for his life."

Florez noted that Perez had alcohol, cannabis, methamphetamine, and amphetamine in his system but did not believe that contributed to Perez's death. She testified that she had "no doubt" the two stab wounds to his clavicle region caused his death.

### D. Additional police investigation

Perez's truck was found in a residential San Antonio neighborhood on May 4, 2020. Texas Ranger Kevin Callihan interviewed a resident who recalled seeing a "dark skin[ned] male" leave the truck there two weeks prior. Texas Ranger Kevin Wright dusted the truck for fingerprints and took portions of the seatbelt for DNA testing. Jeferson's girlfriend gave Callahan consent to search her home, where he found a pair of Jeferson's Nike shoes with blood on them. In a trash can at the home, he found clothing items with blood on them, including a hoodie and a t-shirt with the word "Honduras" on it. The t-shirt was later determined to have Perez's blood on it. The hoodie, Nike shoes, and seat belt clippings were accidentally destroyed by court order after a third party was hired to purge the Crocket County Sheriff's Office evidence locker because the items were mislabeled as belonging to another case for which the statute of limitations had run.

Jeferson was later found in Florida, where he was arrested and ultimately convicted for Perez's murder. In May 2020, Calix-Reyes was arrested in the Bentonville, Arkansas, area on a Texas warrant for Perez's murder. A search of the home where Perez had been staying in Arkansas revealed a pair of FILA sneakers with Perez's blood.

### E. The recorded interview

Following Calix-Reyes's arrest, Texas Department of Public Safety (DPS) Trooper Joel Calloway traveled to Benton, Arkansas to interview Calix-Reyes. Because Calix-Reyes did not speak English and Calloway did not speak Spanish, Luis Lara, a local bilingual police officer, conducted the interview while Calloway was behind a glass window listening with a translator. Lara had never conducted an interview before, so Calloway instructed him. Among other things, he advised Lara to engage in a "rapport building" conversation with Calix-Reyes before reading him his rights.

4

At the start of the interview, Lara asked Calix-Reyes about his background and where he was from. Calix-Reyes responded that he was from Honduras and acknowledged that he had illegally crossed into the U.S. Lara then asked him how "things" were in Honduras. Calix-Reyes reported that he had a very difficult childhood and had been mistreated, causing him to leave home at an early age. Calix-Reyes said a friend contacted him about coming to the U.S. and asked, "do I tell you the whole story?" Lara responded, "Yes. That's what I'm here for. To talk to you. Tell me." Calix-Reyes said that he had been in the U.S. for approximately a year and recalled his earlier attempts to enter the United States, his immigration issues, encounters he had with a cartel in Mexico, and his arrival in San Antonio. He talked about befriending another Honduran National, later identified as Jeferson, who allowed Calix-Reyes to stay at his girlfriend's home for a few days after which the two of them went to Ozona for work and stayed at the home of their "boss," later identified as Perez.

Calix-Reyes explained that Perez paid them each 600 "pesos" after working 12 days. Calix-Reyes reported that Jeferson thereafter robbed him in the middle of the night at knifepoint. Gesturing to his hand, Calix-Reyes claimed that he suffered a cut when he tried to grab the knife from Jeferson. He claimed that after Jeferson took his wallet, he fled and got a ride with a truck driver who took him back to San Antonio. However, because he lost everything in his wallet, including his "papers" and "documentation," he contacted a friend who picked him up in San Antonio and took him to Arkansas. He then stated that he did not know why he had been arrested for murder, asserting he had no criminal background and was "not a murderer."

At this point, Calloway texted Lara and Lara interrupted Calix-Reyes to inform him that before continuing, he needed to read Calix-Reyes his "rights." Lara then read him his rights from the Texas waiver form Calloway had provided and obtained Calix-Reyes's signature on the form.

He then asked Calix-Reyes if he wanted to speak with him. Calix-Reyes responded, "No, if you want to." Lara explained, "It's not what I want. I want you to tell me if you want to keep talking to me." Calix-Reyes responded, "Yes . . . To tell you the whole story."

Then, Calix-Reyes repeated his story about meeting Jeferson and traveling to Ozona after hearing of a work opportunity involving a two-week long bathroom remodeling project. Throughout the interview, Calix-Reyes consistently stated that he and Jeferson slept on separate couches in the living area of Perez's home, while Perez slept in a separate bedroom down the hall. Calix-Reyes stated again that on their last day of work, a Friday evening, Perez paid them each $600 in cash.

Calix-Reyes proceeded to tell varying stories regarding what occurred later that night. First, Calix-Reyes informed Lara that he had been asleep on the couch when Jefferson woke him and demanded his wallet, pulling out a knife. Calix-Reyes said he tried to stop Jeferson and suffered a cut on his hand when doing so. After giving Jeferson his wallet, he fled from the house. And after walking for two or three hours, he received a ride from the driver of a semi-truck back who took him to San Antonio. According to Calix-Reyes, he contacted a friend in Arkansas, Marvin Merlo, who arranged transportation for him to travel there for work. Calix-Reyes reported that he stayed with Marvin's friend in Arkansas and worked there for approximately 15 days before he was arrested.

After a break in the interview, Calix-Reyes agreed to provide a DNA sample, consented to a search of his phone, and allowed Lara to photograph his hands. Lara told Calix-Reyes that law enforcement had arrested Jeferson in Florida for Perez's murder and knew what had happened, encouraging him to tell the truth and "cut to the chase."

6

Calix-Reyes then explained that Jeferson was angry with Perez because Perez had threatened to report them to immigration and because Jeferson believed Perez had not paid them enough for their work. He recounted that while he was sleeping, Jeferson woke him to tell him he had "injured the boss" and they needed to go. He reported that they got in Perez's truck and drove to San Antonio, where they abandoned the truck. He acknowledged throwing out the clothes he had been wearing and said he did so because they were dirty from work. He reported that Jeferson was "high" at the time and asked him for his wallet, saying he would pack it for him. He forgot to get it back when they separated, after which he called his friend in Arkansas for help. He admitted that he, too, was angry with Perez, but said he did not participate in Perez's murder.

After Lara repeatedly encouraged him to tell the truth, Calix-Reyes reiterated that Jeferson was angry with Perez, believing Perez had taken advantage of them, and claimed that he woke up around five or six in the morning to banging noises coming from Perez's bedroom. Calix-Reyes recalled that he entered the bedroom and saw Jeferson with a knife in his hand and Perez on the floor covered in blood. He reported that Perez was alive but appeared to be "drowning." He said he attempted to take the knife from Jeferson, and in doing so, his hand was cut. According to Calix-Reyes, his feet became entangled with Perez's legs and he fell on top of Perez and "got blood all over [him]." He reported that when he fell, he "pricked" or "touched" Perez with the knife and observed that Perez was no longer breathing and had "drowned."

Calix-Reyes then changed his story, claiming that when he entered Perez's bedroom, Jeferson told him to "hit" Perez, and after he replied, "no way," Jefferson lunged at him. Calix-Reyes next said that while attempting to take the knife from Jeferson, the two struggled and Jefferson pushed him, causing him to fall on top of Perez with the knife entering Perez and staying in. According to Calix-Reyes, he snatched the knife from Jeferson then fell on top of Perez "and

7

the knife landed in him and it slipped." He again stated that he believed Perez was alive before he fell but was "no longer alive" after the knife went into his body, acknowledging that the knife went in "very deep" and that he stabbed him "very ugly" on the left side of his body, gesturing to the left shoulder area. Calix-Reyes then claimed he hurt his hand when he fell on Perez.

Toward the end of the interview, Calix-Reyes acknowledged that he had thought about hitting Perez because Jeferson had told him to do so, that he had "planned" to hit Perez, and that the truth is he was going to hit Perez but got tangled and fell on top of him. Although at various times Calix-Reyes claimed he accidentally stabbed Perez when he fell on him, at one point he stated, "[I]t was no accident." At another point, he stated, "It wasn't an accident either, but I did get entangled. I don't know, I think it wasn't an accident but I don't know. I don't remember, at the moment I don't remember." At multiple times during the interview, Calix-Reyes acknowledged participating with Jeferson in the incident.

Calix-Reyes reported that after Perez stopped moving, Jeferson told him to get his things and leave the scene. Because he was scared and nervous, he followed Jeferson's directions and they fled the scene in Perez's truck, abandoning it in San Antonio. According to Calix-Reyes, he did not take anything from Perez's house before they left, but he recalled that Jeferson stayed in the house longer and changed his clothes before leaving.

At the end of the interview, Calix-Reyes admitted to lying at the start of the interview and asserted that he was now telling the truth, admitting that he and Jeferson—who he described as being more hot-tempered than him—were both mad at Perez and that their anger took over. He also stated that he was sorry for participating but said it was Perez's fault for not paying them what he had promised. He concluded the interview by saying "I regret everything I did" and thanking Lara for "bringing out the truth in him."

## F. The motion to suppress

Calix-Reyes was indicted in August 2020 by a grand jury in Crockett County on one count of capital murder, alleging that he intentionally caused Perez's death by stabbing him during the course of committing or attempting to commit robbery and that he presented a deadly weapon, namely a knife or other sharp object, during the commission of the charged offense.

Prior to his jury trial, Calix-Reyes moved to suppress the statements he made during his recorded interview, contending it was conducted in violation of his state and federal constitutional rights as well as the Texas Code of Criminal Procedure. He sought to suppress the interview in whole or at least in part. Calix-Reyes alleged that Lara had subjected him to custodial interrogation prior to reading him his *Miranda* rights; that after reading him his *Miranda* rights, Lara failed to ensure that Calix-Reyes understood his rights as he "mumbled" when reading from the declaration portion of the waiver form; and that based on the "totality of the circumstances," Calix-Reyes did not knowingly and voluntarily waive his rights given his background, youth, and inexperience with the U.S. legal system.

At the suppression hearing, Calix-Reyes, Lara, and Calloway testified regarding the events occurring before and during the interview, and the trial court ordered the certified translator present at the hearing to provide a written Spanish-to-English translation of the recorded interview. After receiving the translation, the trial court denied the motion.

At the start of trial, Calix-Reyes renewed his motion to suppress, raising the same constitutional and statutory violations. The judge who presided over the trial stated that he had reviewed the interview transcript and saw no reason to disturb the earlier judge's order denying the motion. He therefore denied the motion and allowed in both the Spanish-to-English translation of the interview and the recording of the interview itself. The trial court also instructed the jury that it could only

9

consider the interview if it agreed that the State proved beyond a reasonable doubt that Calix-Reyes had knowingly, intelligently, and voluntarily waived his rights.

Following trial, the judge entered Findings of Fact and Conclusions of Law in support of his decision to deny Calix-Reyes's motion to suppress, concluding Calix-Reyes was properly warned of his rights and knowingly, intelligently, and voluntarily waived them.[1] The court also concluded that the initial statements Calix-Reyes made before he waived his *Miranda* rights did not stem from custodial interrogation and instead were made in response to general rapport-building questions from Lara regarding his background, where he was from, and his life in Honduras and the U.S.

### G. Calix-Reyes's trial testimony

At trial, Calix-Reyes testified to much of the same background facts that he did during his interview, chronicling his life in Honduras with an abusive stepmother, his decision to leave his family at age 13 to work on a coffee farm where he made $3.00 a day, and his decision to leave for the U.S. to try to find a brother he believed was living here. He discussed his attempts to cross the border illegally during which he encountered Jeferson, a fellow Honduran National trying to enter the U.S. illegally. He recalled that after successfully crossing the border on his third attempt, Jeferson picked him up and allowed him to stay at the home of his girlfriend and her mother in San Antonio.

After working in San Antonio with Jeferson on a job for which he did not get paid, the girlfriend's mother introduced them to Perez, who transported them to Ozona to work on the bathroom remodeling project. He recalled that they lived in Perez's house with his elderly

---

[1] Calix-Reyes quotes at length from the proposed findings of fact and conclusions of law that the State tendered to the trial court, which is found in the clerk's record on appeal. However, the trial court did not sign those proposed findings and conclusions of law, and instead signed a modified version found in the supplemental record.

grandmother for two weeks, with the two of them sleeping on couches in the living room, while Perez and his grandmother had their own bedrooms. On a Friday evening at the end of the two-week project, Perez paid him and Jefferson $600 each. According to Calix-Reyes, the amount was satisfactory, as he had only been paid $3.00 a day working in Honduras. But he claimed Jefferson told him he was "really upset" with the amount.

Calix-Reyes recalled that as he was getting ready for bed, he went into Perez's room where his things were and saw Perez and Jeferson drinking beer and "smoking [something] in aluminum foil." He then went to sleep on the couch and woke up around 5:30 a.m. to a "ruckus" coming from Perez's bedroom. When he went to the bedroom, he saw Perez on the floor bleeding with his legs stretched out and Jeferson with a knife in his hand. He believed Perez was alive at the time but seemed to be "choking." He testified that Jeferson directed him to "grab the knife and do the same thing." When he said no, Calix-Reyes believed Jeferson intended to stab him, so he grabbed the knife and a struggle ensued. He recalled that he took a step back, became entangled with Perez's feet, and fell on top of Perez with the knife in his hand. He claimed he did not see the knife after he fell, and he left the room "in shock" with his clothes covered in blood. Calix-Reyes recalled that he and Jeferson drove Perez's truck to San Antonio, where he again stayed at the house belonging to Jefferson's girlfriend and her mother before his friend Marvin arranged for him to travel to Arkansas, where he was later arrested.

On cross-examination, Calix-Reyes acknowledged having lied during the first portion of his interview with Lara, explaining that he was scared at the beginning of the interview. Calix-Reyes also acknowledged that even after he admitted to Lara that he had been in Perez's bedroom at the time of the stabbing, his story repeatedly changed regarding the details of how he fell onto Perez's body, how the knife landed on Perez, and how deeply it penetrated Perez's body. He

11

admitted that he was again changing his story at trial, now claiming he could not remember how deeply the knife went in or whether it stayed in Perez's body. Although he admitted having told Lara that the knife went deep into Perez's body and stayed there, he testified that it was not true and that he only told Lara that version of the story because he believed it was what Lara wanted to hear, asserting Lara was calling him a "liar" and he was "tired" at that point.

### H. The jury's verdict and sentencing

The jury unanimously found Calix-Reyes guilty of capital murder. As required by Texas Penal Code section 12.31(a)(2), the trial court sentenced Calix-Reyes to life without parole. *See* Tex. Penal. Code Ann. § 12.31 (a)(2) ("An individual adjudged guilty of a capital felony in a case in which the state does not seek the death penalty shall be punished by imprisonment in the Texas Department of Criminal Justice for . . . life without parole, if the individual committed the offense when 18 years of age or older."). This appeal followed.

## II. ISSUES ON APPEAL

On appeal, Calix-Reyes raises four issues. In his first two issues, which he addresses in one global issue, Calix-Reyes contends the trial court erred in denying his motion to suppress the statements he made during his interview. In his third issue, he contends the trial court erred in refusing to correct a passage in the interview translation before it was provided to the jury and its admission resulted in an improper jury verdict. In his fourth issue, he contends the evidence was insufficient to support his conviction. We address the evidentiary issues first then assess legal sufficiency.

## III. THE ADMISSION OF CALIX-REYES'S STATEMENTS TO LAW ENFORCEMENT

In Issues One and Two, Calix-Reyes argues that Lara's "actions" in obtaining his interview statements violated his federal and state constitutional rights as well as his rights under Article

38.22 of the Texas Code of Criminal Procedure, and that the resulting statements were obtained in violation of the same rights. Therefore, he urges, the trial court erred in denying his motion to suppress the statements he made during the interview.

### A. Standard of review

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *See Alford v. State*, 358 S.W.3d 647, 652 (Tex. Crim. App. 2012); *see also Valles v. State*, No. 08-23-00241-CR, 2024 WL 4728421, at *4–5 (Tex. App.—El Paso Nov. 8, 2024, pet. ref'd) (mem. op., not designated for publication). We afford "almost total deference to the trial judge's rulings on questions of historical fact and on application of law to fact questions that turn upon credibility and demeanor," but we review "*de novo* the trial court's rulings on application of law to fact questions that do not turn upon credibility and demeanor." *Alford*, 358 S.W.3d at 652; *see also Weems v. State*, 493 S.W.3d 574, 577 (Tex. Crim. App. 2016) (recognizing same). "The same deferential standard of review is applied to a trial court's determination of facts that are based on a video recording admitted at the suppression hearing." *Valles*, 2024 WL 4728421, at *5 (citing *State v. Duran*, 396 S.W.3d 563, 570 (Tex. Crim. App. 2013)). Appellate courts may nevertheless review *de novo* "indisputable visual evidence" contained in a videotape. *Id.* (citing *Duran*, 396 S.W.3d 563, 570). Additionally, we conduct a *de novo* review as to pure questions of law. *State v. Woodard*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011).

A trial court's ruling on a motion to suppress "will be sustained if it is correct on any applicable theory of law and the record reasonably supports it." *State v. Arellano*, 600 S.W.3d 53, 57–58 (Tex. Crim. App. 2020) (citing *State v. Ruiz*, 581 S.W.3d 782, 785 (Tex. Crim. App. 2019). When the trial court makes findings of fact, a reviewing court determines whether the evidence, viewed in the light most favorable to the court's ruling, supports those findings. *Valles*, 2024 WL

4728421, at *5 (citing *Abney v. State*, 394 S.W.3d 542, 548 (Tex. Crim. App. 2013)). The prevailing party is afforded the "strongest legitimate view of the evidence," along with all reasonable inferences that can come from it. *Id*. (citing *Duran*, 396 S.W.3d 563, 571 (quoting *State v. Weaver*, 349 S.W.3d 521, 525 (Tex. Crim. App. 2011)).

### B. Applicable law

To meet constitutional standards, a confession must be taken in compliance with the U.S. Supreme Court's holding in *Miranda* and Article 38.22 of the Code of Criminal Procedure. *Pace v. State*, 986 S.W.2d 740, 747 (Tex. App.—El Paso 1999, pet. ref'd); Tex. Code Crim. Proc. Ann. art. 38.22, § 2; *Jones v. State*, 944 S.W.2d 642, 650 n. 11 (Tex. Crim. App. 1996). Both *Miranda* and Article 38.22 require virtually identical warnings prior to custodial interrogation, including a warning that the accused has the right to remain silent; that any statement may be used against the accused in a court of law; that the accused is entitled to an attorney; and that if he is unable to afford an attorney, he has the right to an appointed attorney to advise him; however, Article 38.22 adds that an accused must be warned of his right to terminate the interview at any time. *See Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007) (citing Tex. Code Crim. Pro. Ann. art. 38.22 § 2 (a)(5)). Relevant to situations when a suspect makes an oral statement, Article 38.22 provides that no oral statement "of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless: [there is] an electronic recording," and "prior to the statement but during the recording the accused is given the [required] warnings . . . and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning."[2] Tex. Code Crim. Pro. Ann. art. 38.22 § 3 (a)(1) and (2). Thus, the recording must reflect not only that

---

[2] The Code further provides that the recording device must have been "capable of making an accurate recording" and that all voices on the record must be identified. Tex. Code Crim. Pro. Ann. art. 38.22 § 3(3) and (4).

the warnings were given, but that the defendant knowingly, intelligently, and voluntarily waived "the rights they reference." *See State v. Lujan*, 634 S.W.3d 862, 865 (Tex. Crim. App. 2021).

When a defendant claims his statements were obtained in violation of either *Miranda* or Article 38.22, he has the initial burden to establish that his statements were the product of custodial interrogation. *Herrera*, 241 S.W.3d at 526. Only if successful does the burden shift to the State to establish by a preponderance of the evidence that the defendant knowingly, intelligently, and voluntarily waived his rights prior to making his statements. *Lujan*, 634 S.W.3d at 865 (citing *Joseph v. State*, 309 S.W.3d 20, 25 (Tex. Crim. App. 2010) (Keller, P.J., concurring)).

### C.  Analysis

Calix-Reyes provides multiple reasons why he believes the trial court erred by denying his motion to suppress his statements, which we address separately below.

### (1)  Calix-Reyes was not subjected to custodial interrogation before being read his *Miranda* rights

On appeal, as in the trial court, Calix-Reyes argues Lara engaged in custodial interrogation for approximately 12 minutes prior to providing his *Miranda* rights, and because of this "complete failure to give the statutory warnings," the trial court should have suppressed any statements that followed. We disagree. Although Calix-Reyes was in custody at the start of the interview, as he had already been arrested, the record supports the trial court's finding that he was not subjected to "interrogation" before Lara read him his rights.

"Not all post-arrest police questioning can be classified as 'interrogation,'" and certain types of questions may be considered "outside the constitutional definition of 'interrogation.'" *Jones v. State*, 795 S.W.2d 171, 174 (Tex. Crim. App. 1990) (en banc). Thus, "the mere fact that a suspect is under arrest does not automatically establish the suspect is being interrogated."

15

*Castilla*, 2018 WL 442231, at *2 (citing *Alford*, 358 S.W.3d at 653). Instead, as "conceptualized" in *Miranda*, interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980); *see also State v. Nelson*, No. 08-22-00174-CR, 2023 WL 4237770, at *7 (Tex. App.—El Paso June 28, 2023, no pet.) (mem. op., not designated for publication) (recognizing that "[i]nterrogation is more than 'subtle compulsion'").

Accordingly, under both *Miranda* and Article 38.22, if a defendant makes a "voluntary statement," even while in custody, it will be admissible at trial if it was not in response to an "interrogation." *See Castilla*, 2018 WL 442231, at *2 (citing *Stevens v. State*, 671 S.W.2d 517, 520 (Tex. Crim. App. 1984)); *see also Pugh v. State*, 624 S.W.3d 565, 568 (Tex. Crim. App. 2021) (recognizing that "volunteered statements are not barred by *Miranda*, even when the accused is in custody") (citing *Arizona v. Mauro*, 481 U.S. 520, 529 (1987); Tex. Code Crim. Proc. Ann. art. 38.22, § 5 (providing that "[n]othing in this article precludes the admission of a statement made by the accused . . . of a statement that does not stem from custodial interrogation . . .")).

In determining what constitutes interrogation, the Texas Court of Criminal Appeals in *Jones* looked to the following definition provided by the U.S. Supreme Court in *Innis*:

> We conclude that the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.

*Jones*, 795 S.W.2d at 174 (quoting *Innis*, 446 U.S. at 300–02).

16

In line with *Innis*, the court held that "'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 174; *see also State v. Cruz*, 461 S.W.3d 531, 537 (Tex. Crim. App. 2015) (recognizing same). The court noted that the "'should know' test . . . focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Cruz*, 461 S.W.3d at 537; *see also Alford*, 358 S.W.3d at 653 (recognizing same).

In contending he was subjected to custodial interrogation, Calix-Reyes seeks to analogize his case to *Hernandez v. State*, 13 S.W.3d 78 (Tex. App.—Texarkana, 2000, no pet.), in which a defendant was interviewed at a jail following his arrest for driving under the influence. There, officers asked the defendant "what he had been drinking, whose pickup it was, was he driving it, had he been smoking marihuana, and whether he had been smoking crack cocaine." *Hernandez*, 13 S.W.3d at 82. The court found that these questions constituted custodial interrogation for purposes of both *Miranda* and Article 38.22, as the officers should have known the questions were reasonably likely to elicit an incriminating response. *Id.* at 81–82.

In contrast, here, Lara did not ask Calix-Reyes any questions relating either directly or indirectly to Perez's murder prior to reading him his rights. Instead, Lara's initial questions regarded where Calix-Reyes was from, how long he had been in the U.S., and how things were in Honduras. In response, Calix-Reyes described his childhood in Honduras and his attempts to enter the U.S., asking Lara if he should tell his "whole story." Lara responded in the affirmative, telling Calix-Reyes he was there to "talk to [him]" and encouraged Calix-Reyes to "tell [him]." Calix-Reyes continued uninterrupted for at least five more minutes, describing his attempts to enter the

17

U.S. and the difficulties he encountered in doing so. But when Calix-Reyes, without any prompting, began delving into the events in Ozona, Lara stopped him and read him his rights.

We agree with the trial court's conclusion that Lara's questions to Calix-Reyes before reading him his rights did not constitute interrogation, as they were not likely to elicit an incriminating response. Lara's questions were instead designed to elicit background information and build rapport with him, and were therefore outside the constitutional definition of "interrogation." *See Cruz*, 461 S.W.3d at 538 (recognizing that "a biographical question may be deemed 'not interrogation' under the 'booking' (or 'administrative') exception [and] a court could decide that a particular question about biographical data was a routine administrative inquiry"); *Duncan v. State*, No. 14-16-00808-CR, 2018 WL 3028051, at *5 (Tex. App.—Houston [14th Dist.] June 19, 2018, no pet.) (mem. op., not designated for publication) (concluding that officer's questions regarding appellant's prior encounters with law enforcement were not an interrogation regarding the crime for which the suspect had been arrested, "but were instead questions designed to build rapport with appellant") (citing *Ruth v. State*, 167 S.W.3d 560, 571 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (stating that general and routine questions do not constitute interrogation)).

In addition, Calix-Reyes never claimed he felt compelled to make an incriminating statement in response to Lara's introductory prewarning questions. He testified at trial that he only felt pressured to tell Lara "what he wanted to hear" well after he was *Mirandized*, when he claimed he was getting tired and believed Lara was accusing him of lying. Moreover, Lara's initial questions did not in fact elicit an incriminating response regarding the charge. To the contrary, although Calix-Reyes informed Lara he had been in Ozona, he did not admit to any wrongdoing,

he denied being a "murderer," and instead claimed he was the victim of a robbery. It was only after he was *Mirandized* that he made any incriminating statements.[3]

Accordingly, we agree with the trial court that Calix-Reyes was not subjected to custodial interrogation prior to receiving his *Miranda* warnings.[4]

### (2) The record reflects that Calix-Reyes validly waived his *Miranda* rights

Calix-Reyes also maintains that his interview with Lara should have been suppressed because he did not voluntarily, intelligently, and knowingly waive his *Miranda* rights once they were read to him. We agree with the trial court's conclusion that after Calix-Reyes was informed of his *Miranda* rights, he voluntarily, intelligently, and knowingly waived them.

As set forth above, after speaking for approximately 12 minutes, Lara informed Calix-Reyes that before continuing, he was required to read him his "rights," stating, "like anyone else, you have rights just like me." He showed Calix-Reyes the waiver form in Spanish, which listed both his *Miranda* rights and his rights under the Texas Code of Criminal Procedure and further contained a declaration that the suspect understood those rights and was freely and voluntarily

---

[3] We also note that because Lara did not engage in any custodial interrogation prior to reading Calix-Reyes his *Miranda* rights and because Calix-Reyes made no incriminating statements prior to being *Mirandized*, we cannot consider this to be an improper "question first, warn later" tactic, in which an officer interrogates a suspect without providing *Miranda* warnings, obtains a confession, and thereafter *Mirandizes* the suspect only to have him repeat his incriminating statements. *See Banks v. State*, No. 14-11-00722-CR, 2013 WL 1907884, at *5–7 (Tex. App.—Houston [14th Dist.] May 7, 2013, pet. ref'd) (mem. op., not designated for publication) (rejecting appellant's claim that he was subjected to an improper "question first, warn later 'tactic'" where the officers did not initially interrogate him prior to reading him his rights).

[4] Moreover, given the fact that Calix-Reyes did not make any incriminating statements regarding the charges prior to being *Mirandized*, and instead asserted his innocence, we cannot say that Calix-Reyes was harmed by the admission of any of his prewarning statements. *See Bates v. State*, 494 S.W.3d 256, 272 (Tex. App.—Texarkana 2015, pet. ref'd) (defendant was not harmed by the erroneous admission of the statements he made to officers before being *Mirandized* where his statements were not inculpatory in nature); *Coffey v. State*, 435 S.W.3d 834, 843 (Tex. App.—Texarkana 2014, pet. ref'd) (concluding beyond a reasonable doubt that the admission of the defendant's recorded interview with law enforcement did not contribute to the jury's verdict where the defendant did not make any inculpatory statements on the recording).

waiving them. Lara told Calix-Reyes that he wanted him to look at the form while he was reading

him the rights set forth therein. The following colloquy occurred thereafter:

> **Lara** (reading from the waiver form): I, prior to giving this statement, have been duly warned by obviously me Luis Lara . . . [the] person to whom I am giving this statement that, number one says, I have the right to remain silent, and not to make any statement . . . That can be used against me at trial, okay? Do you understand number one?

> **Calix Reyes**: That I shouldn't talk?

> **Lara**: No, no, it says, I have the right to remain silent and not to make any statements that can be used against me during my trial. Okay, you have that right. The second says, uh says, Any statement I make can be used in court as evidence against me. I have the right to have a lawyer present for advice. Uhm, To advise me. Number three says, Prior to and during the interrogation, if I am not able to hire a lawyer, I have the right to be appointed one to advise me legally and during the interrogation and I have the right to terminate this interview at any time. Okay, do you understand your rights?

> **Calix-Reyes**: Rights. Since I do not have anyone who is here who can help me they can put me a free lawyer who can help me, something like that?

> **Lara:** Yes. Those are your rights. Okay?

Lara then directed Calix-Reyes where to place his signature on the form, advising him to

sign his full name. Lara began reading from the waiver form again and the following exchange

occurred:

> **Lara:** During the issuance of this declaration I have complete knowledge, intelligence, and have renounced the rights set forth in this signing document having renounced full recognition [mumble] will to these rights I surrender this declaration freely and voluntarily. Okay so, give me a moment. Okay, so,since I read your rights, uhm, do you want to keep talking to me? Do you want to talk to me?

> **Calix-Reyes:** No, if you want to.

> **Lara:** It's not what I want. I want you to tell me if you want to keep talking to me.

> **Calix-Reyes**: Yes

20

**Lara:** Yes?

**Calix-Reyes**: To tell you the whole story.

Calix-Reyes appears to acknowledge that the record reflects Lara appropriately read him his rights as required by both *Miranda* and Article 38.22, asserting that when Lara realized his "oversight" in failing to provide Calix-Reyes with the necessary warnings, Lara "carefully and slowly read [him] the Article 38.22 and *Miranda* Warnings." However, Calix-Reyes contends the record does not reflect that he made a knowing, intelligent, and voluntary waiver of his rights, in part because Lara mumbled when he read the portion of the form in which Calix-Reyes was declaring he understood and was waiving his rights.

In determining whether a suspect made a knowing, intelligent, and voluntary waiver of his rights, we employ a "totality-of-the-circumstances approach," which considers "all the circumstances surrounding the interrogation," including the defendant's experience, background, and conduct. *See Joseph*, 309 S.W.3d at 25 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). Whether a valid waiver occurred can be broken into two broad and often overlapping categories. *See Lujan*, 634 S.W.3d at 865 (noting that a waiver has "two aspects"). First, we evaluate whether the suspect's relinquishment of his rights was "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Joseph*, 309 S.W.3d at 25 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Second, we evaluate whether the waiver was made with "full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* "Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.*

### (a) Voluntariness

A confession is considered involuntary if the defendant's will was "overborne" and his "capacity for self-determination critically impaired." *Sandoval v. State*, 665 S.W.3d 496, 523 (Tex. Crim. App. 2022) (citing *Schneckloth v. Bustamante*, 412 U.S. 218, 225 (1973)). "Factors taken into account in addressing this question are 'the youth of the accused, his lack of education or his low intelligence, the lack of any advice about constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep.'" *Id.* (citing *Schneckloth*, 412 U.S. at 226). Even with these factors, "an essential element of any due-process involuntariness claim is law-enforcement overreaching." *Id.* (citing *Colorado v. Connelly*, 479 U.S. 157, 163–64 (1986)).

Here, as the trial court recognized in its findings of fact, Lara testified at the suppression hearing that he did not coerce, threaten, or make any direct or indirect promises to Calix-Reyes.[5] Nor does anything in the record indicate that Lara made any such threats, engaged in any type of physical punishment, or engaged in any other arguably coercive or intimidating actions. As the trial court found, Lara did not deny Calix-Reyes any "basic necessities like restroom breaks or something to drink." To the contrary, Calix-Reyes was given a drink at the start of the interview, was offered an additional drink during the interview, was asked if he was hungry, and was afforded at least one bathroom break during the interview. We also note Lara's testimony that Calix-Reyes did not appear to be under the influence of alcohol or narcotics, and Calix-Reyes never claimed that he was. Nor does the record suggest that he suffered from any impairment.

---

[5] A promise made by a law enforcement officer may also "render a confession involuntary if it was positive, made or sanctioned by someone with apparent authority, was of some benefit to the defendant and was of such a character as would likely cause a person to speak untruthfully." *Garcia v. State*, 919 S.W.2d 370, 388 (Tex. Crim. App. 1994) (en banc), on reh'g (Mar. 27, 1996). Here, Calix-Reyes does not contend Lara made any improper promises, nor do any appear in the record.

Calix-Reyes, however, points to his relatively young age (24 years), his limited education (reaching only the seventh grade in Honduras), and his inexperience with the criminal justice system (having no prior arrests) as factors that rendered his waiver involuntary. These factors, without more, do not suggest Calix-Reyes was so mentally deficient that he could not understand his rights or the significance of waiving them. *See Licon v. State*, 99 S.W.3d 918, 925 (Tex. App.— El Paso 2003, no pet.) (mentioning that the appellant's evidence of being "young and [having] some learning difficulties does not, standing alone, render his statement inadmissible"). "Youth is usually not enough, by itself, to render a statement inadmissible; it is merely a factor to consider in determining the voluntariness of the confession." *See Perales v. State*, No. 2-07-268-CR, 2008 WL 4531659, at *4 (Tex. App.—Fort Worth Oct. 9, 2008, pet. ref'd, untimely filed) (mem. op., not designated for publication) (citing *Oursbourn*, 259 S.W.3d at 173). Nor does a suspect's limited education or experience standing alone render his confession involuntary, as a suspect could be "uneducated and illiterate and yet still understand the nature of the rights he is waiving and voluntarily give a confession." *Id*.

At trial, Calix-Reyes claimed he only admitted to participating in Perez's stabbing because he was tired and nervous and because Lara called him a "liar" during the interview, prompting him to tell Lara a false story. Although Lara did suggest at times that he did not believe Calix-Reyes was telling the truth, that did not constitute coercion or otherwise render his confession involuntary. *See Wyatt v. State*, 23 S.W.3d 18, 23–25 (Tex. Crim. App. 2000) (rejecting defendant's claim that his confession was coerced because interrogating officers called him a liar and "talked short" to him). In addition, though Calix-Reyes indicated he was tired at the start of the interview, he did not appear to be sleep-deprived at any time during the interview; he did not nod off at any time; and he did not inform Lara that he was too tired to continue. Nor did he request

23

a break to rest at any time.[6] Instead, he told Lara he wanted to tell him the whole story, speaking freely and coherently to Lara for the remaining three-plus hours of the interview. We therefore cannot say that Lara's claim of being tired at any point in the interview rendered his statements involuntary. *See Sandoval*, 665 S.W.3d at 524 (recognizing that a claim of "tiredness," standing alone, does not show that a suspect's "will was overborn so that his capacity for self-determination was impaired").

Considering the circumstances, we reject the claim that Calix-Reyes's statements were made involuntarily as there is nothing in the record to suggest they were the product of any intimidation, coercion, or deceptions such that his will was "overborne" or his "capacity for self-determination critically impaired." *Sandoval*, 665 S.W.3d at 523; *see also Joseph*, 309 S.W.3d at 26 (holding that the defendant's statement was voluntary where a detective warned the defendant about his rights, the defendant willingly participated in a six-hour interview, the defendant never asked that the interview be stopped, and the record did not demonstrate any evidence of intimidation, coercion, or undue promises by police).

### (b) Awareness

We also conclude Calix-Reyes waived his rights with awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them. Prior to the interview, Lara ascertained that Calix-Reyes spoke Spanish, and Calix-Reyes never indicated that he had any issue understanding Lara, who testified he was fluent in Spanish. Calix-Reyes, however, maintains he was unable to understand Lara when he read the portion of the waiver form in Spanish declaring he understood his rights and was knowingly waiving them. According to

---

[6] At the start of the interview, Calix-Reyes said he had been falling asleep before Lara entered the room. When Lara asked if he was tired, Calix-Reyes replied, "Yes. Working since I came to this state."

Calix-Reyes, after Lara read him his *Miranda* rights in a slow and clear manner, Lara began to speed up, lower his tone, and mumble when he was reading this portion of the form, pointing out that the translator herself noted Lara mumbled at one point. According to Calix-Reyes, Lara's reading of the waiver portion of the form was so "incoherent" and "inarticulate" that no one could have understood him. He therefore contends that, combined with the other factors set forth above (his youth, limited education, and limited experience with the criminal justice system), we should conclude that he did not, and could not have, made a knowing and intelligent waiver of his rights. We disagree.

It is well-established that although a valid waiver will not be presumed from a suspect's silence after being read his *Miranda* rights, a waiver "need not assume a particular form and in some cases, 'a waiver can be clearly inferred from the actions and words of the person interrogated.'" *Joseph*, 309 S.W.3d at 24–25 (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). Here, we can infer that Calix-Reyes understood his rights, as he actively engaged with Lara as he read his rights and asked for clarification regarding his rights, including his right to free counsel. Then, after reading his rights, when Lara asked Calix-Reyes if he still wanted to talk to him, and Lara clarified that it was up to him, Calix-Reyes said, "Yes . . . . To tell you the whole story." He thereafter voluntarily continued telling Lara the story of how he ended up in Ozona with Jeferson and what occurred the night of Perez's stabbing.[7]

---

[7] In his brief, Calix-Reyes asserts that while in custody "no one informed [him] of his legal right to contact or discuss the circumstances of his arrest with the Honduran Consulate." Calix-Reyes maintains that "[t]he Vienna Convention on Consular Relation grants a foreign national who has been arrested, imprisoned, or taken into custody a right to contact his consulate and requires the arresting government authorities to inform the individual of this right 'without delay.'" And he claims that "[w]ithout the benefit of such a discussion with the Consular of Honduras, [he] was left with absolutely no competent understanding of his [constitutional and statutory] rights." However, the Texas Court of Criminal Appeals has indicated that even when a suspect is not informed of his rights under Article 36 of the Vienna Convention on Consular Relations, the "exclusion of evidence is not an appropriate remedy in that situation," as the failure to inform a suspect of his Article 36 rights is "unlikely, with any frequency, to produce unreliable confessions" and "there is likely to be little connection between an Article 36 violation and evidence or statements obtained by

Additionally, Calix-Reyes signed a waiver, which stated in Spanish, as translated by Lara: "Previous and during my interview that I get this declaration [sic], I knowingly and voluntarily have renounced my rights explaining this document," followed by a signature line. Under the signature line, the form states, "Having renounced my rights voluntarily and . . . knowingly giving [up] my rights and voluntarily [and] knowingly I have renounced my rights." While Calix-Reyes claimed at the suppression hearing that he did not understand those two sentences when Lara read them to him, he did not indicate that he had any difficulty reading the declaration to himself at the hearing. And at trial, Calix-Reyes acknowledged that he was able to read and write Spanish, and more particularly, that he had the opportunity to read the declaration he was signing, although he claimed not to have paid "a lot of attention" to it as he was "scared" at the time.

The trial court was in the best position to assess Calix-Reyes's credibility to determine whether he did in fact understand his rights as read to him by Lara and as set forth in the waiver he signed. *See Moreno v. State*, No. 08-18-00179-CR, 2020 WL 7090696, at *4–5 (Tex. App.—El Paso Dec. 4, 2020, no pet.) (not designated for publication) (holding that the trial court did not abuse its discretion in concluding that the defendant waived his rights with the requisite awareness to make his waiver knowing and intelligent, where the record supported a finding that after being read his rights, the suspect "indicated that he understood his rights by signing and initialing each of the listed rights on the *Miranda* card and signing the bottom of it"). We refrain from second guessing the trial court's conclusion that he knowingly, voluntarily and intelligently waived his rights. *See id.*; *see also Valtierra v. State*, 310 S.W.3d 442, 447–48 (Tex. Crim. App. 2010). (recognizing that a court affords "almost total deference to a trial judge's determination of

police." *Sandoval v. State*, 665 S.W.3d 496, 524 (Tex. Crim. App. 2022) (citing *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 347–50 (2006)).

historical facts," especially those based on the evaluation of the credibility and weight to be given to a witness's testimony, and will "sustain the trial court's ruling if that ruling is 'reasonably supported by the record and is correct on any theory of law applicable to the case'").

### (3) Calix-Reyes did not invoke his right to counsel

Finally, Calix-Reyes contends Lara responded "improperly" when Calix-Reyes asked him a clarifying question about his right to counsel during the following colloquy:

> **Lara**: Number three says, Prior to and during interrogation, if I am not able to hire a lawyer, I have the right to be appointed one to advise me legally and during the interrogation and I have the right to terminate this interview at any time." Okay, do you understand your rights?
>
> **Calix-Reyes**: Since I do not have anyone who is here who can help me they can put me a free lawyer who can help me, something like that?
>
> **Lara**: Yes. Those are your rights. Okay?

Rather than just repeating that he had a right to counsel, Calix-Reyes maintains Lara was required to clarify whether he understood his right to counsel and was agreeing to waive it. We disagree.

The law clearly distinguishes between situations in which a suspect makes an unequivocal and unambiguous request for counsel and those in which a suspect's reference to counsel is ambiguous. When an accused makes a clear request for counsel at any time during an interrogation, the officers must cease their questioning until counsel has been provided or until the suspect voluntarily reinitiates communication. *Davis v. State*, 313 S.W.3d 317, 338–41 (Tex. Crim. App. 2010). If, however, the suspect only makes an ambiguous reference to counsel, while it may be good police practice to seek clarification regarding whether the accused truly wishes to invoke the right to counsel before continuing their questioning, interrogating officers are not required to do so. *See Thacker v. State*, No. 08-18-00085-CR, 2020 WL 1303555, at *3 (Tex. App.—El Paso Mar. 19, 2020, pet. ref'd) (not designated for publication) (citing *Davis*, 313 S.W.3d at 339

27

(holding that "after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney, and declining "to adopt a rule requiring officers to ask clarifying questions" when a suspect makes an ambiguous reference to counsel); *see also Davis*, 313 S.W.3d at 339 (recognizing that "[t]o trigger law enforcement's duty to terminate the interrogation, a suspect's request for counsel must be clear, and the police are not required to attempt to clarify ambiguous remarks").

Whether a statement referring to a lawyer constitutes a clear request for counsel depends on the statement itself and the totality of the circumstances surrounding the statement. *Davis*, 313 S.W.3d at 339 (citing *State v. Gobert*, 275 S.W.3d 888, 892 (Tex. Crim. App. 2009)). "The test is objective: whether the suspect "articulate[d] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id*. (citing *Gobert*, 275 S.W.3d at 892–93). But "Texas courts have uniformly held that when a suspect asks a generalized question seeking to clarify the right to counsel, this is not considered an unambiguous or unequivocal expression of a desire to invoke the right to counsel." *Thacker*, 2020 WL 1303555, at *4 (citing *inter alia Robinson v. State*, 851 S.W.2d 216, 223–24 (Tex. Crim. App. 1991) (en banc) (holding that suspect's question asking, "Do I need to talk to a lawyer before I sign?" was equivocal and did not invoke the right to counsel)).

Here, Calix-Reyes did no more than seek to clarify whether he had the right to a "free lawyer" as opposed to making an unequivocal or unambiguous request for counsel. *See, e.g.*, *Loredo v. State*, 130 S.W.3d 275, 284–85 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (holding that suspect's question, "Can I ask for a lawyer now?" was not an unambiguous invocation of right to counsel). Accordingly, Lara was under no obligation to ascertain whether Calix-Reyes wished to assert his right to counsel; instead, he appropriately reiterated to Calix-

28

Reyes that he did in fact have such a right. Calix-Reyes did not make any attempt to assert his right to counsel thereafter. Rather, he signed the declaration on the waiver form and told Lara he wished to tell him his "whole story."

Accordingly, viewing the record in the light most favorable to the trial court's ruling and considering the totality of the circumstances, we conclude that the trial court did not abuse its discretion in denying Calix-Reyes's motion to suppress the statements he made during the interview. Calix-Reyes's first two issues are overruled.

## IV. THE ALLEGED ERRORS IN THE SPANISH-TO-ENGLISH TRANSLATION

In Issue Three, Calix-Reyes contends the trial court erred in denying his request to correct the translation of his interview before it was submitted to the jury. He points to a passage in which he was relaying to Lara that when he entered Perez's bedroom, he saw Jeferson with a knife in his hand and tried to take it from him, noting that the translator switched pronouns and translated "estaba con el cuchillo en la mano pero estaba vivo el señor" as "I was with the knife in my hand but the man was alive." Calix-Reyes contends this was an obvious error on the part of the translator, as the statement should have been that "he" (Jeferson) had the knife his hand. He maintains that the trial court's decision to admit the "uncorrected" translation in evidence was harmful and "should result in a reversal of [his] conviction."

### A. Applicable law and standard of review

It is well-established that a translation must be "true" and "accurate" but need not be "perfect." *See Linton v. State*, 275 S.W.3d 493, 501–02 (Tex. Crim. App. 2009); *see also Peralta v. State*, 338 SW.3d 598, 604 (Tex. App—El Paso, 2010) (recognizing same). "Because the proper handling of translation hinges on a variety of factors, including the defendant's knowledge of English and the complexity of the proceedings and testimony, the trial judge, who is in direct

29

contact with the defendant, must be given wide discretion" in determining whether to admit a translation at trial. *Linton*, 275 S.W.3d at 502–03. Therefore, a trial court's decision to admit a translation at trial should not be reversed absent a clear abuse of discretion, "that is, only when his ruling lies outside the zone of reasonable disagreement." *Id.* at 503. The "ultimate question" in determining whether a trial abused its discretion in admitting a translation is "whether any inadequacy in the [translator's] interpretation made the trial 'fundamentally unfair.'" *Id.*

In addition, Texas Rule of Evidence 1009 provides that a translation of a foreign language document is admissible if, at least 45 days before trial, the proponent serves on all parties: "(1) the translation and the underlying foreign language document; and (2) a qualified translator's affidavit or unsworn declaration that sets forth the translator's qualifications and certifies that the translation is accurate." Tex. R. Evid. 1009 (a)(1)(2). Rule 1009 further provides, "[a] party must serve [an] objection on all parties at least 15 days before trial," and if the "underlying foreign language document is otherwise admissible, the court must admit—and may not allow a party to attack the accuracy of—a translation submitted under subdivision (a) unless the party has: (1) submitted a conflicting translation under subdivision (a); or (2) objected to the translation under subdivision (b)." Tex. R. Evid. 1009 (b) and (c).

### B. Analysis

During the suppression hearing in May 2022, the trial court ordered the certified translator, Janet Arenivas, to prepare a Spanish-to-English translation of Lara's interview and provide it to the court and both parties. At trial, both parties acknowledged receiving Arevinas's translation in July 2022, over a year before Calix-Reyes's September 2023 trial. Neither party objected to any part of the translation or submitted an alternative translation. Nevertheless, midway through trial, Calix-Reyes's attorney asserted that he had just observed what he believed was an inaccuracy in

the translation, as described above, and had spoken to Arenivas, who agreed that given the context, it would be appropriate to switch the pronoun to state that "he" (Jeferson) held the knife, rather than "I" (Calix-Reyes) held the knife. As the State points out, the request to correct the translation was made well after the 45-day deadline set forth in Rule 1009.

But even overlooking Calix-Reyes's failure to timely object, we cannot say the trial court abused its discretion in refusing his request to make the "correction." In refusing Calix-Reyes's request, the trial court recognized—and Calix-Reyes's attorney agreed—that in the passage, Calix-Reyes used a word that was susceptible to two meanings. We agree with the trial court's reasoning that the translator complied with the requirements of Rule 1009 by providing a certification that her translation was true and accurate, and the fact that the phrase in question was susceptible to two meanings did not render her translation inadmissible. Moreover, as the trial court informed Calix-Reyes's attorney at trial, he was free to address the issue with the jury and could call the translator or "anybody [else] to the stand" to explain the phrase's two meanings. Yet Calix-Reyes did not call Arenivas or anyone else to the stand to address the issue. Nor did Calix-Reyes attempt to clarify the passage during his testimony. To the contrary, during cross-examination when the prosecutor asked Calix-Reyes about the passage and whether he told Lara, "Yes, I was with the knife in my hand but the man was alive," Calix-Reyes agreed that he did. In sum, the translator's interpretation did not make the trial fundamentally unfair. *Linton*, 275 S.W.3d at 503.

Accordingly, we conclude that the trial court did not abuse its discretion in refusing to "correct" this passage in the translation and that the translation was properly admitted in evidence. Calix-Reyes's third issue is overruled.

## V. THE EVIDENCE WAS LEGALLY SUFFICIENT TO SUPPORT THE JURY'S VERDICT

31

Having concluded that both the translation and the recording of Calix-Reyes's interview were properly admitted at trial and could have been relied upon by the jury in determining his guilt, we turn to Calix-Reyes's fourth and last issue in which he contends the evidence was insufficient to support the jury's finding.

## A. Standard of review

Though Calix-Reyes maintains that the evidence presented at trial was factually insufficient to support his conviction, Texas courts view the legal sufficiency standard set forth by the United States Supreme Court in *Jackson v. Virginia* as the only standard of review in determining the sufficiency of the evidence in criminal cases. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). We will therefore apply that standard in conducting our review.

To assess legal sufficiency, "a court must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Geick v. State*, 349 S.W.3d 542, 545 (Tex. Crim. App. 2011) (quoting *Jackson*, 443 U.S. at 319). "On appeal, the same standard of review is used for both circumstantial and direct evidence cases." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Thus, "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Hooper*, 214 S.W.3d at 13).

In conducting our review, we may "look at 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act'" to support the jury's verdict. *See Guevara v. State*,

32

152 S.W.3d 45, 49 (Tex. Crim. App. 2004) (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id*.

The factfinder is the sole judge of weight and credibility of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We therefore defer to the trier of fact to "resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper*, 214 S.W.3d 9, 13*; see also Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim App. 2018) (recognizing same). "The fact-finder is responsible for judging the credibility of witnesses and may find credible all, some, or none of the testimony that the witnesses give." *Romano v. State*, 610 S.W.3d 30, 34 (Tex. Crim. App. 2020) (citing *State v. Ross*, 32 S.W.3d 853, 857 (Tex. Crim. App. 2000)). We do not reweigh evidence or substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Thus, "[w]hen the record supports conflicting inferences, a reviewing court must 'presume that the factfinder resolved the conflicts in favor of the prosecution' and defer to that determination." *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) (citing *Jackson*, 443 U.S. at 326).

"For the evidence to be sufficient, the State need not disprove all reasonable alternative hypotheses that are inconsistent with the defendant's guilt." *Id*.; *see als*o *David v. State*, 663 S.W.3d 673, 678 (Tex. Crim. App. 2022) (the evidence need not negate every conceivable alternative to a defendant's guilt to be sufficient). We therefore do not consider whether "possible alternative explanations" could support a finding that the defendant was not guilty; instead, our only focus is on "whether the inferences necessary to establish guilt are reasonable based upon the

cumulative force of all of the evidence when considered in the light most favorable to the verdict."

*Wise*, 364 S.W.3d at 903 (citing *Hooper*, 214 S.W. 3d at 13).

### B. Applicable law

A person commits capital murder if he "commits murder as defined under Section 19.02(b)(1)," and he "intentionally commits the murder in the course of committing or attempting to commit . . . robbery . . . ." Tex. Pen. Code Ann. § 19.03(a)(2); *see also Saenz v. State*, 166 S.W.3d 270, 273 (Tex. Crim. App. 2005) (recognizing that a person may be charged with capital murder if the murder is committed in the course of the commission of certain other offenses, as listed in the Penal Code). In turn, Penal Code § 19.02(b)(1) provides that a person commits the offense of murder "if the person . . . intentionally or knowingly causes the death of an individual." Tex. Pen. Code Ann. § 19.02(b)(1).

The State charged Calix-Reyes with one count of capital murder, alleging that he intentionally caused Perez's death by stabbing him and did so in the course of committing or attempting to commit a robbery. At trial, the State posited two theories upon which the jury could have found that Calix-Reyes committed or attempted to commit the robbery: either by stealing the money Perez had been paid by the homeowner for the remodeling job (based on the fact that no cash was found in Perez's wallet after the stabbing) or by stealing Perez's truck.

### C. Analysis

Calix-Reyes contends there was insufficient evidence to support a finding that he either murdered Perez or committed robbery. In making this argument, he initially argues that the only evidence linking him to the murder stemmed from statements he made during his interview with Lara and re-urges that those statements should not have been admitted based on the alleged

34

violations of his constitutional and statutory rights. As discussed above, we have already rejected those arguments and found that his statements were properly admitted.

Calix-Reyes, however, contends that even if his interview was properly admitted, it did not establish he was guilty of capital murder because he never admitted to murdering Perez or committing a robbery. According to Calix-Reyes, at most, his statements suggested that he accidentally fell on Perez while holding the knife, and a rational juror could not have used his statements to conclude that he intentionally caused Perez's death. There are several problems with this argument.

Although at times Calix-Reyes claimed he did not intentionally stab Perez, at other times he expressly stated that he "participated" in the stabbing, that he stabbed Perez "very deep[ly]" when he fell, that he had "thought about" hurting Perez before he fell, and that he was sorry for what he did. In addition, while Calix-Reyes may not have expressly stated that he "intentionally" stabbed Perez, the jury could have inferred from his statements and the circumstances surrounding the offense that he had the intent to do so. As we have previously recognized, "[t]here is seldom direct evidence of a defendant's intent in committing an offense, and therefore, 'a culpable mental state must generally be inferred from the circumstances'" surrounding the offense. *See Soria v. State*, No. 08-20-00074-CR, 2022 WL 2965979, at *7 (Tex. App.—El Paso July 27, 2022, no pet.) (not designated for publication) (citing *Romano*, 610 S.W.3d at 35). This includes the defendant's acts, words, and conduct before, during, and after the offense. *Id*. (citing *Zavala v. State*, No. 08-17-00136-CR, 2019 WL 2241669, at *4 (Tex. App.—El Paso May 24, 2019, pet. ref'd) (not designated for publication) (a defendant's culpable mental state is generally proven by circumstantial evidence, and the jury may consider events before, during, and after the commission of the offense).

There are several factors from which the jury could have inferred that Calix-Reyes had the intent to murder Perez. Calix-Reyes provided Lara inconsistent stories regarding what occurred at the time of Perez's stabbing then changed his story again at trial. It is well-established that "inconsistencies in a defendant's story can provide evidentiary support for a conviction." *Nisbett*, 552 S.W.3d at 266. False statements to law enforcement in an attempt to cover up a crime may also evince a consciousness of guilt and support a finding of guilt. *See King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (en banc) (recognizing that a defendant's conduct in lying to police officers shows a consciousness of guilt and may be considered as circumstantial evidence of guilt).

In addition, by his own admission, Calix-Reyes fled the scene without calling for assistance despite knowing Perez's dire situation. As Calix-Reyes himself recognizes, evidence of flight may show a "consciousness of guilt" from which a jury can infer a defendant's intent. *Bigby v. State*, 892 S.W.2d 864, 884 (Tex. Crim. App. 1994) ("Evidence of flight . . . shows a consciousness of guilt of the crime for which the defendant is on trial."); *see also Cruz v. State*, 690 S.W.2d 246, 250 (Tex. Crim. App. 1985) (en banc) (recognizing that evidence linking a defendant to a crime scene "when coupled with other suspicious circumstances, including subsequent flight, may tend to connect the accused to the commission of the offense"). Though Calix-Reyes claimed he fled the scene out of fear, the jury was free to reject this explanation and infer from the record that he fled the scene to avoid apprehension. *See Arnold v. State*, No. 08-23-00038-CR, 2024 WL 50227, at *5 (Tex. App.—El Paso Jan. 4, 2024, no pet.) (mem. op., not designated for publication) (recognizing that the jury could have rejected the defendant's claim that he fled the crime scene "out of fear" and inferred that he instead did so "to avoid apprehension"); *see also Laster v. State*, 275 S.W.3d 512, 523 (Tex. Crim. App. 2009) (where the record allows for more than one

36

reasonable inference, "[a]s long as the verdict is supported by a reasonable inference, it is within the province of the factfinder to choose which inference is most reasonable").

Further, while Calix-Reyes is correct that his DNA was not found on the knife or clothing items at the crime scene, that did not serve as conclusive evidence that he was not involved in the murder; to the contrary, the jury could still consider other evidence linking the defendant to the murder, including the defendant's own confession. *Hall v. State*, 569 S.W.3d 646, 659–60 (Tex. Crim. App. 2019).

Calix-Reyes also finds it significant that Jeferson was convicted of Perez's murder prior to Calix-Reyes's trial and that one of the jail employees where Jeferson and Calix-Reyes had been held while awaiting trial testified that Jeferson exhibited violent tendencies while Calix-Reyes did not. According to Calix-Reyes, the jury could have inferred from this evidence that Jeferson was the more violent of the two and was the one responsible for committing Perez's murder. While true, the jury could have reasonably found from the evidence presented at trial that both he and Jeferson participated in the murder, as Calix-Reyes indicated in his interview. This was consistent with the State's theory at trial as well as the forensic examiner's testimony that there may have been two knives used in the stabbing (one smooth and one serrated) and the fact that Perez (who weighed 180 pounds) suffered 94 stab wounds, including a vast amount of defensive wounds, making it unlikely that only one person was responsible for the murder.

Finally, it is undisputed that following the stabbing, law enforcement did not find any money on Perez's person despite the homeowner's testimony that she paid him in cash earlier that day. As well, by Calix-Reyes's own admission, he and Jeferson fled the crime scene in Perez's truck, clearly without his permission. *See Moore v. State*, 542 S.W.2d 664, 675 (Tex. Crim. App. 1976), abrogated on other grounds by *Butler v. State*, 830 S.W.2d 125 (Tex. Crim. App. 1992)

(recognizing that "the legislature did not intend to provide for capital murder only where the killing takes place at the same place and about the same time as the robbery"). The jury therefore could have relied on this evidence in concluding Calix-Reyes murdered Perez during the course of a robbery.

Viewing the evidence in the light most favorable to the jury's verdict, we conclude that based on the cumulative force of the evidence, a rational trier of fact could have found the essential elements of capital murder beyond a reasonable doubt. Appellant's fourth issue is overruled.

## VI. CONCLUSION

We affirm Calix-Reyes's conviction for capital murder.


LISA J. SOTO, Justice

March 28, 2025

Before Salas Mendoza, C.J. Palafox and Soto, JJ.

(Do Not Publish)